506 A.2d 580

Anthony GRANDISON

v.

STATE of Maryland.

Nos. 65 & 108, Sept. Term, 1984.

Court of Appeals of Maryland.

April 1, 1986.

**690**

692

694

Nancy L. Cook, Assigned Public Defender, Washington, D.C., for appellant.

Deborah K. Chasanow, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

COUCH, Judge.

The appellant, Anthony Grandison, Sr., was charged in Baltimore County with conspiracy to murder Scott and Cheryl Piechowicz, first degree murder of Scott Piechowicz and Susan Kennedy, and use of a handgun in the commission of a crime of violence. Grandison challenges the verdict of guilt and the subsequent death sentence imposed by a jury in the Circuit Court for Somerset County where he was tried on his request for removal. He raises a host

of grounds for reversal. As we conclude that none of these grounds involves reversible error, we shall affirm.

With respect to the underlying facts giving rise to the charges against Grandison, we recently recited them in *Evans v. State,* 304 Md. 487, 494–95, 499 A.2d 1261, 1264–65 (1985), and therefore shall borrow from that recitation as follows:

"According to the State's evidence, the defendant Evans and Anthony Grandison entered into an agreement whereby Evans would kill David Scott Piechowicz and his wife, Cheryl, because the couple were scheduled to testify against Grandison in a narcotics case pending in the United States District Court for the District of Maryland. Evans was to receive $9,000.00 from Grandison for performing the murders.

David Scott Piechowicz and Cheryl Piechowicz were employed at the Warren House Motel in Baltimore County. On April 28, 1983, Susan Kennedy, the sister of Cheryl Piechowicz, was working in place of Cheryl at the Warren House Motel. The evidence was sufficient to prove beyond a reasonable doubt that, on April 28th, Evans went to the motel and, not knowing the Piechowiczs, shot David Scott Piechowicz and Susan Kennedy with a MAC–11 machine pistol. Nineteen bullets were fired at the victims, who died from the multiple gunshot wounds.

A two count indictment was filed against Evans and Grandison in the United States District Court. They were charged with violating the Piechowiczs' civil rights by interfering with their right to be witnesses in a judicial proceeding, in violation of 18 U.S.C. § 241, and with witness tampering, in violation of 18 U.S.C. § 1512.

Subsequently the present case began with a four count indictment in the Circuit Court for Baltimore County, charging Evans and Grandison each with two counts of first degree murder, one count of conspiracy to commit murder, and use of a handgun in the commission of a felony or crime of violence. Upon the defendants' re-

quests for removal, Grandison's trial was transferred to the Circuit Court for Somerset County and Evans's trial was transferred to the Circuit Court for Worcester County."

Prior to the trial in the instant case, Grandison and Evans were convicted on the federal charges and sentenced to life plus ten years imprisonment. They then filed pretrial motions to dismiss the charges in their respective state cases on double jeopardy grounds. The motions were denied by the trial judges, and this Court affirmed. *Evans and Grandison v. State,* 301 Md. 45, 481 A.2d 1135 (1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985).

Thereafter, the trial proceeded in Somerset County and Grandison was found guilty of all charges. Subsequently, a sentencing proceeding was held pursuant to Maryland Code, Art. 27, § 413, wherein the jury imposed death penalties for the two murder convictions. The trial judge also sentenced Grandison to life imprisonment for the conspiracy conviction and twenty years for the handgun violation consecutive to the life sentence. These sentences were imposed to run consecutively to the life plus ten years sentence previously imposed in the federal case.

We shall now address Grandison's arguments in turn as raised.

I

*Failure to Inquire into Mental Capacity of State Witness Sparrow*

Grandison complains that his constitutional right of witness confrontation and cross-examination was impaired by the trial court's refusal to permit appropriate steps to be taken to determine the mental capacity and veracity of State's witness Charlene Sparrow. Vernon Evans raised the same issue in his trial in the Circuit Court for Worcester County. In *Evans v. State,* 304 Md. 487, 508, 499 A.2d 1261, 1272 (1985) we stated in pertinent part:

"In determining whether a request for a mental examination should be granted, however, a trial judge should carefully balance the demonstrated necessity for a compelled examination against the existence of important countervailing considerations. In affirming the denial of a motion for a psychiatric examination of a government witness, the United States Court of Appeals for the District of Columbia Circuit, in *United States v. Benn,* 476 F.2d 1127, 1131 (D.C.Cir.1972), listed some of the factors to be considered:

'[A] psychiatric examination may seriously impinge on a witness' right to privacy; the trauma that attends the role of complainant ... is sharply increased by the indignity of a psychiatric examination; the examination itself could serve as a tool of harassment; and the impact of all these considerations may well deter the victim of ... a crime from lodging any complaint at all. Since there is no exact measure for weighing these kinds of dangers against the need for an examination, the decision must be entrusted to the sound discretion of the trial judge in light of the particular facts.' *Accord, United States v. Butler,* 481 F.2d 531 (D.C.Cir. 1973). *See Rasnick v. State,* 7 Md.App. 564, 571–572, 256 A.2d 543 (1969), *cert. denied,* 400 U.S. 835, 91 S.Ct. 70, 27 L.Ed.2d 67 (1970)."

What we stated in *Evans* is applicable here and is dispositive of the issue. Hence, the trial court did not commit reversible error.

## II

### *Venue*

Grandison next argues that the indictments handed down in Baltimore County are void since venue for the crimes charged did not lie in Baltimore County.

Grandison was indicted on June 30, 1983 in Baltimore County; he was ultimately tried and convicted in Somerset County pursuant to his suggestion for removal under for-

mer Maryland Rule 744.[1] The appellant argues that since the acts committed constituting the crimes of accessory before the fact to murder, conspiracy, and unlawful use of a handgun in commission of a crime of violence indisputably occurred in Baltimore City, he was wrongfully indicted and prosecuted in Baltimore County.

Prior to trial, Grandison moved to dismiss the conspiracy count (Count III) of the indictment on the ground that the Grand Jury for Baltimore County lacked jurisdiction. At the February 27, 1984 hearing, he amended his motion to dismiss to allege improper venue. Judge Simpkins denied the motion, relying on *Lievers v. State*, 3 Md.App. 597, 241 A.2d 147 (1968) and *Greenwald v. State*, 221 Md. 245, 157 A.2d 119, *appeal dismissed*, 363 U.S. 721, 80 S.Ct. 1599, 4 L.Ed.2d 1521 (1960). We hold that Judge Simpkins committed no error in denying Grandison's motion to dismiss.

### (A)

■ This Court has held that if conspirators enter into an illegal agreement in one county and go into another county to execute or carry out their illegal plans and *there* commit an overt act in furtherance of their agreement, each of the conspirators may be tried in either county; evidence of an express renewal of their agreement need not be established to prosecute the conspirators in the county where the overt act was committed. *Greenwald*, 221 Md. at 254, 157 A.2d at 124, quoting from *People v. Mather* (N.Y.), 4 Wendall 229, 259, 21 Amer. Dec. 122, 147.

---

1. Former Md.Rule 744 provided:
 "a. *Capital Cases.*
 When a defendant is charged with an offense for which the maximum penalty is death and a party files a suggestion under oath that he cannot have a fair and impartial trial in the court in which the case is pending, the court shall order that the case be transmitted for trial to another court having jurisdiction. A suggestion filed by a defendant shall be under his personal oath. A suggestion filed by the State shall be under the oath of the State's Attorney."

The underlying rationale for this principle lies in what has been termed the "continuing nature of conspiracy;" that is, "The law considers that wherever [the conspirators] act, there they renew, or, . . . continue their agreement, and this agreement is renewed or continued as to all whenever any of them does an act in furtherance of their common design." *Greenwald,* 221 Md. at 254, 157 A.2d at 124.

In *Lievers,* the Court of Special Appeals recognized the rule that a conspiracy may be prosecuted "where the illegal agreement arose, or where [the] overt act in furtherance of the agreement occurred. . . ." 3 Md.App. at 605, 241 A.2d at 152.

Chief Judge Murphy, in writing for the Court of Special Appeals in *Boddie v. State,* 6 Md.App. 523, 252 A.2d 290 (1969), applied the holding of *Lievers.* In *Boddie,* the appellants were in the State of Maryland when the overt act in furtherance of the conspiracy to rob occurred. However, the illegal agreement in that case seemingly took place outside of the territorial limits of the state. Nonetheless, the court held if the evidence could sustain a finding that a conspiracy existed, the conspirators could be punished in Maryland. *Boddie,* 6 Md.App. at 529, 252 A.2d at 293. This rule is in accord with, and indeed follows from, decisions rendered by the Supreme Court. In *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), the Court was considering whether venue in a conspiracy case under § 5440 Rev. Stat. (1901) properly lies in the state or district where the conspiracy was entered into or any state or district where an overt act in furtherance of the conspiracy was performed. In its analysis, the Court stated "that a conspiracy is not necessarily the conception and purpose of the moment, but may be continuing." *Id.* at 363, 32 S.Ct. at 800, 56 L.Ed. at 1124. Moreover, wherever the conspirators act there they "renew, or perhaps, to speak more properly, they continue, their agreement, and this agreement is renewed or continued as to all whenever any one of them does an act in furtherance of their common design." *Id.* at 365, 32 S.Ct. at 801, 56 L.Ed. at 1125 (quoting

*Robinson v. United States,* 172 Fed. 105 (8th Cir.1909)); *accord United States v. Kissel,* 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (U.S.N.Y. 1910); *see United States v. Mayo,* 721 F.2d 1084, 1090 (7th Cir.1983); *see generally* 1 F. Wharton, *Criminal Law* § 14 (14th ed. 1978).

We note that, though the Court in *Hyde* was analyzing a statute which required allegation and proof of an overt act, it still accepted the characterization of a conspiracy as "continuing" and "ongoing." *See Mayo,* 721 F.2d at 1090. Such a characterization convinces us that the rule expressed in *Lievers* and applied in *Boddie* is sound.

Accordingly, appellant's argument must fail. Since the murders occurred in Baltimore County and were a contemplated result of an ongoing, continuing scheme of which appellant was co-author, venue for the conspiracy count was proper in Baltimore County.

### (B)

Grandison next attempts to specifically challenge venue for the murder and handgun counts as being improperly set in Baltimore County. He argues that since he was indicted and prosecuted outside the county in which the acts he committed occurred, Baltimore City, the indictment charging him as an accessory before the fact to murder and of a handgun violation should have been dismissed.

■ The short answer to appellant's contention is that venue for the murder and handgun counts was never challenged in the trial court.[2] Thus, this argument was waived. Md. Rule 885;[3] *McBurney v. State,* 280 Md. 21, 32–33, 371 A.2d 129, 135–36 (1977).

---

2. It is clear from the transcript of February 27, 1984 that Grandison sought only to dismiss Count III (conspiracy) of the indictment on the basis that venue was improper.

3. Maryland Rule 885 provides:
 "*Rule 885. Scope of Review—Limited to Questions Decided by Circuit Court.*

However, considering the nature of the proceedings before us, we entertain appellant's argument but are compelled to summarily dismiss it as being without merit.

■ It is a generally recognized principle that where the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the logical and natural consequences of acts committed by his fellow conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy. *See U.S. v. Wenzel,* 311 F.2d 164 (4th Cir.1962); *Urciolo v. State,* 272 Md. 607, 631, 325 A.2d 878, 892 (1974) (embezzlement). *Accord Commonwealth v. Thomas,* 410 Pa. 160, 189 A.2d 255, 258, *cert. denied,* 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963). Such responsibility attaches even though the conspirator was not physically present when the acts were committed by his fellow conspirators and would extend even to a homicide which is a contingency of a natural execution of the conspiracy, even though such homicide is not specifically contemplated by the parties. *See Urciolo,* 272 Md. at 631, 325 A.2d at 892; *accord Thomas,* 189 A.2d at 258. *See generally* 1 F. Wharton, *supra;* 21 Am.Jur.2d §§ 386–87 (1965).

■ This rule rests on the underlying principle that one who encourages, aids, abets, or assists the active perpetrator in the commission of the offense, is a guilty participant, and in the eye of the law is equally culpable with the one who does the act. *See, e.g., Urciolo,* 272 Md. 607, 325 A.2d

This Court will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the circuit court; but when a point or question of law had been presented to the court and a decision of that point or question of law by this Court is necessary or desirable for the guidance of the circuit court, or to avoid the expense and delay of another appeal to this Court, the point or question of law may be decided by this Court even though it was not decided by the circuit court. When jurisdiction cannot be conferred on this Court by waiver or consent of the parties, a question as to the jurisdiction of the circuit court may be raised and decided in this Court, whether or not raised and decided in the circuit court."

878; *accord Bloomer v. State,* 48 Md. 521 (1878); *see Ex Parte Williams,* 383 So.2d 564, 565 (Ala.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). And this criminal accountability extends to the proximate, natural and logical consequences of the conspiracy. *Williams,* 383 So.2d at 565. It follows that the law looks upon such a conspirator as an actual participant in the contemplated offense. In short, the act of the co-conspirators in the case at bar was the act of Grandison.

■ The determination of venue in the instant case must rely upon this theory of vicarious criminal responsibility which arises out of the existence of the conspiracy. The conspiracy in which Grandison took part had as its goal and sole objective the homicides of two victims. As a co-conspirator, Grandison became criminally responsible for the acts of his fellow conspirators; acts which were committed in Baltimore County. Since the record reveals that in this conspiracy Grandison played a principal role, he is subject to venue at the situs of the crime. Accordingly, in our view, had the issue been properly raised, it would be without merit.

### III

*Separate Trials as to Counts*

Grandison also asserts that the charges of conspiracy and handgun violation were improperly tried in Somerset County in conjunction with the murder charges.

Appellant was charged in a four count indictment with the murders of Scott Piechowicz and Susan Kennedy, conspiracy to murder Scott and Cheryl Piechowicz, and use of a handgun in the commission of a crime of violence. He sought removal of the case for trial without reference to counts. Subsequently, he moved to separate the trial of the conspiracy count from the trial of all other counts. Appellant argued that he intended to take the witness stand in his own defense with respect to the conspiracy charge but wished to remain silent with respect to the murder charges.

After the proceedings were removed to Somerset County, the motion for separate trials was denied. We perceive no error in the denial of appellant's motion.

■ It is uncontroverted that the decision as to whether to grant a severance lies within the sound discretion of the trial court. *Stevenson v. State*, 43 Md.App. 120, 130, 403 A.2d 812, 818 (1979), *aff'd*, 287 Md. 504, 413 A.2d 1340 (1980); *State v. Jones*, 284 Md. 232, 238, 395 A.2d 1182, 1185 (1979). The trial court, in exercising its discretion, is required to balance the likely prejudice to the accused against the possible effects on economy and efficiency in judicial administration. *McKnight v. State*, 280 Md. 604, 609–10, 375 A.2d 551, 555 (1977).

■ Moreover, we note that in considering a charge of conspiracy, the overt acts of the conspirators in the commission of the crime are clearly relevant and material to the proof of the conspiracy. *See Jones v. State*, 8 Md.App. 370, 379–80, 259 A.2d 807, 813 (1969); *Hill v. State*, 231 Md. 458, 461, 190 A.2d 795, 796 (1963). It follows that in the case at bar, evidence of the homicides and surrounding circumstances is relevant and material to the conspiracy which in the first instance contemplated and directed their commission. The homicides at issue here are clearly related to the conspiracy.[4]

■ Additionally, absent authority to the contrary, it would be "foolhardy and purposeless to require as of right two trials—one for a crime committed and one for conspiracy to commit the same crime." *Green v. State*, 25 Md. App. 679, 686, 337 A.2d 729, 733 (1975). At trial, appellant offered no authority or compelling justification for a finding that a severance was warranted. Only the following took place at the February 27, 1984 hearing, in pertinent part:

---

**4.** Appellant does not argue that the conspiracy under which he is charged is unrelated to the homicides committed in furtherance of the conspiracy. *Cf. McKnight v. State*, 280 Md. 604, 375 A.2d 551 (1977).

"THE COURT: Three. Motion for Separate Trials under Counts 1, 2 and 4. I guess what you're saying, you're asking that Counts 1, 2 and 4 be tried and that Count 3 be tried separately.

Counts 1 and 2 are murder, first degree murder, and 4 is a handgun violation, and 3 is conspiracy. What you're saying is that the charges be severed and that we have two separate trials.

All right. I'm ready to hear from you on that. You want to be heard on that, sir?

MR. GRANDISON: Yes, sir. Yes, Your Honor.

THE COURT: All right, sir.

MR. GRANDISON: The position on this motion is that counts should be severed because I intend to take the stand as to Count 3, but not as to Counts 1 and 2, which the State is seeking the death penalty. My position is that if cases are tried jointly, if I take the stand, then I would be subject to being cross-examined as to any prior conviction that I may have. I feel that this might be very prejudicial to me as to those two counts which the State is seeking the death penalty.

THE COURT: Are you saying that the reason those counts should be separate is because—did I understand you to say in Counts 1 and 2 you don't want to take the stand, but on Count 4 you do?

MR. GRANDISON: Count 3 is the conspiracy offense. I intend to take the stand and testify, offer testimony.

THE COURT: I see.

MR. GRANDISON: But as to Count 1 and 2, I do not wish to testify.

THE COURT: All right. And because of that, you think the cases should be separated, that the counts should be separated. Is that the only reason?

MR. GRANDISON: That's not the only reason. I have additional reasons in my memorandum.

THE COURT: What are they?

MR. GRANDISON: I'm sorry, Your Honor. I have no additional reason other than what I stated."

\* \* \* \* \* \*

MR. GRANDISON: The conspiracy offense in this case is a distinct offense from the substantive offense which is first degree murder charges. I don't believe it to be true that evidence that would be admissible in the conspiracy count would be admissible as well in the first degree murder case.

I have no authority rightly before me to support that position. I think this is—the law is clear on that as well as the rules, that evidence may be admissible in a conspiracy, but not be admissible to substantive offense.

I think that I am entitled to a separate trial on these two counts, especially in light of the fact that I have presented to the Court that I wish to take the stand as to the conspiracy and not as to the first degree murder counts.

This is not no ordinary run-of-the-mill case. The State is seeking the death penalty on first count of the indictment, the first two counts of the indictment. I think the situation would be different from any other case and I think that I'm entitled to a separate trial on these counts, and I submit."

\* \* \* \* \* \*

"MR. GRANDISON: Your Honor, offer one additional thing. To force me into a trial of Count 3 along with the first two counts in the indictment would be a—put me in the position where I would have to offer defense for my alleged co-defendant as well, where I wouldn't be in that position if I was being tried separate for both counts. But being as the conspiracy count, the State would allege different things as act or allegedly committed by three co-defendants which would force me in a position to have to defend the act allegedly committed by them which I think would be very prejudicial and no way could I

receive a fair trial being tried in all these counts together."

We are unable to find any authority for the proposition that a trial court is required to grant a motion for separate trials as a matter of right to a criminal defendant upon an allegation by that defendant that he wishes to testify on less than all counts charged against him. In this case, Grandison has done little more than express a generalized desire to testify as to some counts but not others. He has not indicated what he would or would not have testified to and whether such testimony would have been of any particular importance. We are thus unable to conclude that appellant has demonstrated compelling prejudice resulting from denial of the motion for separate trials when we have been given no indication that testimony to be offered or withheld by appellant had any value. *See McKnight,* 280 Md. at 609–10, 375 A.2d 551.

Therefore, we conclude that Grandison's bare allegation proffered in support of his motion, with nothing more, under the record before us is no basis for mandating a severance of trial. *See, e.g., United States v. Corbin,* 734 F.2d 643, 648–49 (11th Cir.1984). It follows, then, that there was no abuse of discretion on the part of the trial court in denying appellant's motion for separate trials.

■ Considering the allegation that the conspiracy and handgun counts were improperly removed along with the murder counts from Baltimore County in the first instance, we conclude this argument to be without merit.

As Judge Simpkins correctly noted at trial, "You remove the whole case, not parts of it." More particularly, former Md. Rule 744 [5] speaks in terms of transferral of the "case" or "case file."

Further, in *Stevenson v. State,* 9 Md.App. 152, 263 A.2d 36 (1970), the Court of Special Appeals held that "[E]ven though [an] indictment contains other counts which charge

---

5. *See supra* note 1 and accompanying text.

offenses which are not punishable by death, those offenses are carried along with the removal of the offense that is or may be punishable by death, and are also removed for trial." *Id.* at 162, 263 A.2d at 41.

Finally, we note that appellant's initial motion did not express the intent to remove only the murder counts from Baltimore County. Indeed, appellant's "Motion and Affidavit for Removal of Trial" filed in this case demanded a removal of appellant's *trial.* As we have stated herein, it was proper for appellant's entire *trial,* encompassing all counts which were enumerated in the Baltimore County Grand Jury Indictment to be removed pursuant to former Md.Rule 744.

Therefore, in light of the plain language enunciated in former Md.Rule 744 and *Stevenson,* 9 Md.App. 152, 263 A.2d 36, we hold that the trial court did not err in transferring the entire proceeding to Somerset County.

## IV

### Insanity Plea

We turn now to the issue of whether the trial court erred in refusing to grant appellant's request to file a plea of insanity. The request was made on April 25, 1984, the day before trial was scheduled to begin.

The procedures governing the assertion of the insanity defense at the time of the Grandison trial were dictated by section 12–108 of the 1982 Health—General Article of the Maryland Code and former Maryland Rule 731.[6] The rule and the statute must be read in conjunction. Their combined provisions require the defense of insanity to be interposed in writing at the time the initial plea is made; the

---

**6.** The provisions of § 12–108 of the 1982 Health—General Article of the Maryland Code can now be found in § 12–109(a)(1) and (2) of that article. Maryland Code (1982, 1985 Cum.Supp.), Health—General Article, § 12–109; *see* 1984 Md.Laws 501. The provisions of former Md.Rule 731 a are now contained in Maryland Rule 4–242(a) while former Rule 731 b 2 is now Rule 4–242(b)(3).

initial plea must be made within fifteen days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to former Md. Rule 723. This period is automatically extended if a motion, demand for particulars, or other paper requiring a ruling by the court or compliance by a party before entering a plea is filed. Former Md. Rule 731 b 2. Such a filing delays the deadline for entering a plea until fifteen days after the court has ruled on the motion. *Id.*

Both the statute and the rule provide for an exception to these time constraints. The court may accept an insanity plea at any time before commencement of the trial upon a showing of "good cause."

Appellant posits two theories under which he contends the trial court should have accepted his insanity plea. First, he asserts that his plea was timely under former Rule 731 b 2, and the court was therefore without discretion to reject it. In the alternative, appellant argues that he made an adequate showing of "good cause" as required by § 12–108 and former Rule 731 b 2; hence he was entitled to plead insanity prior to the commencement of trial.

Appellant's first argument fails since no "motion, demand for particulars, or other paper ... requiring a ruling by the court or compliance by a party before entering a plea" was ruled upon by the court in the fifteen day period preceding his attempted entry of the insanity plea.[7] Consequently, the automatic extension of former Rule 731 b 2 does not come into play. Since the defendant made his

---

7. The docket reflects that in the fifteen day period from April 11, 1984 to April 26, 1984, the following rulings were made by the circuit court: April 11, 1984—Defendant's Motion for Re-removal denied; April 13, 1984—Defendant's Motion to Withdraw Voluntarily or to Otherwise Disqualify Judge denied; April 16, 1984—Order to issue subpoena duces tecum; April 18, 1984—Order to transfer inmate issued; April 19, 1984—Order to issue subpoena duces tecum; April 19, 1984—Defendant's Motion for Continuance denied; April 25, 1984—Order for mental examination of defendant issued; April 26, 1984—Defendant's Renewal of Motion for Continuance denied; April 26, 1984—Defendant's Motion for Individual Voir Dire granted in part.

first Rule 723 appearance before the court on July 19, 1983, the fifteen day period during which he had a right to file the insanity plea had expired long before April 25, 1984.

Thus, Grandison was entitled to enter a late plea of insanity only upon a showing of "good cause." Maryland Code (1982), Health—General Article, § 12–108; former Md. Rule 731 b 2. Although not in the context of the insanity plea, we have previously held that a statutory requirement of "good cause" vests the trial court with wide discretion. *See State v. Frazier*, 298 Md. 422, 470 A.2d 1269 (1984) (discussing "good cause" in context of postponement of trial date); *State v. Jones*, 270 Md. 388, 312 A.2d 281 (1973) (analysis of "good cause" requirement to permit a requested withdrawal of an accused's jury trial waiver). We now hold that the "good cause" requirements of § 12–108 and former Rule 731 likewise endow the trial court with broad discretion. Thus the trial judge's determination is entitled to the utmost respect and should not be overturned unless there was a clear abuse of that discretion. *Madore v. Baltimore County*, 34 Md.App. 340, 346, 367 A.2d 54, 58 (1976).

Because we feel that Judge Simpkins' ruling was not the result of an abuse of discretion, we refuse to disturb it. The only evidence proffered by the defense at the hearing to determine whether there was "good cause" warranting the acceptance of a late insanity plea was the appellant's unsubstantiated allegations that he had been committed to a mental hospital at age nine and that "as late as 1980—the Court psychiatrist had determined [him] to be functioning on the borderline."

The paucity of proof was a direct result of the appellant's refusal to submit to a court provided psychiatric examination which ironically had been initiated pursuant to appellant's April 25, 1984 request that the court "arrange proper psychiatric examination." At the April 26, 1984 hearing, Judge Simpkins gave a first hand account of the events precipitated by Grandison's request for a mental evaluation:

"[I]t was filed by the defendant 19 hours before Court was to start. In order to save time and to comply with this, to get him the examination that he requested in the plea and to give him the hearing that he requested, and to give him the findings of the examination, I contacted a psychiatrist who is employed by the Department of Health and Mental Hygiene, and asked him if he would arrange for a psychiatric examination. He was kind enough to arrange that examination after he got off work last night.

He went to the Wicomico County Detention Center last night at 5:15 to meet with Mr. Grandison. He met with Mr. Grandison.... Mr. Grandison wouldn't talk with him.

\* \* \* \* \* \*

Now, that put us in this position. This man wanted then, before we do anything else, before he would be interviewed by the doctor, as he had requested, he refused to talk to the doctor until he had a chance to talk to his standby counsel—not his counsel, because he was representing himself, but to his standby counsel—who was then some 35 miles away in another county, which would have meant we had to get hold of Crawford [standby counsel], get Crawford, find him, get him to the Detention Center in Salisbury, have the conversation, hoping the doctor—who was doing the Court a favor— would agree to stick around, have the examination, type up the findings sometime before 9:30 this morning, and have it all done in time for Court at 9:30, a ridiculous situation."

■ In our view, the trial court afforded Grandison ample opportunity to adduce evidence of "good cause" for allowance of the late insanity plea. His failure to do so was the result of his unjustifiable refusal to cooperate with the court appointed psychiatrist. There is no constitutional right to have counsel present at a psychiatric examination to determine sanity. *United States v. Byers,* 740 F.2d 1104

(D.C.Cir.1984); *United States v. Cohen*, 530 F.2d 43, 48 (5th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Bohle*, 445 F.2d 54, 67 (7th Cir. 1971); *United States v. Baird*, 414 F.2d 700, 711 (2d Cir. 1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970); *United States v. Albright*, 388 F.2d 719, 726–27 (4th Cir.1968).

A defendant is, however, entitled to the assistance of counsel in determining whether to submit to a psychiatric examination. *Estelle v. Smith*, 451 U.S. 454, 471, 101 S.Ct. 1866, 1877, 68 L.Ed.2d 359, 374 (1981). Since Grandison was acting as his own counsel, the only possible complaint he might have is that he was denied assistance of standby counsel in determining whether to undergo mental evaluation. However, the April 25, 1984 "Plea" itself reflects that this was not so. It requests that the court "arrange proper psychiatric examination of Defendant" and is signed by both the defendant and his standby counsel. Also, at the April 26th hearing, standby counsel, acting at the request of the defendant, stated that prior to the filing of this plea "Mr. Grandison and I had a considerable discussion about the fine distinction between competency to stand trial and insanity at the time the crime was committed." Thus, it is clear that the decision to undergo psychiatric evaluation was made after consultation with standby counsel. Therefore, there was no excuse for appellant's subsequent refusal to proceed with the examination. He cannot now complain that he was not given an opportunity to demonstrate "good cause" or that the trial court's refusal of the insanity plea was in error. The defense did not demonstrate "good cause" for entry of the late plea. Thus, the trial judge properly exercised his discretion in refusing to accept the insanity plea.

## V

### *Violation of Former Md.Rule 746*

Grandison claims that the charges against him should have been dismissed because he was not tried within 180

days of his arraignment and there was no postponement for good cause by an administrative judge pursuant to Maryland Code (1957, 1982 Repl. Vol., 1985 Cum.Supp.), Art. 27, § 591 and former Md.Rule 746.[8] The record reveals that Grandison was first arraigned in the Circuit Court for Baltimore County on July 19, 1983; thus the 180 days requirement of Rule 746 started to run making January 15, 1984 the expiration date before which the case was to be tried in the Circuit Court for Baltimore County. Trial was initially set for November 11, 1983, but was subsequently postponed until January 3, 1984. The case was removed from the Circuit Court for Baltimore County to the Circuit Court for Somerset County on December 16, 1983, on Grandison's motion. The record is silent as to what, if anything, occurred on January 3, 1984. It is clear, however, that on January 20, 1984 the Circuit Court for Somerset County set the trial date for April 26, 1984. Grandison moved to dismiss based on two grounds; first, he argued to the trial judge that once the 180 days had elapsed (January 15, 1984)

---

**8.** Now Md.Rule 4–271, which provides:

*Rule 4–271. Trial date*

(a) *Trial Date in Circuit Court.*—The date for trial in the circuit court shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213, and shall be not later than 180 days after the earlier of those events. On motion of a party, or on the court's initiative, and for good cause shown, the county administrative judge or that judge's designee may grant a change of a circuit court trial date.

Art. 27, § 591 provides:

*§ 591. Setting date for trial; postponement.*

(a) Within two weeks after the arraignment of a person accused of a criminal offense, or within two weeks after the filing of an appearance of counsel or the appointment of counsel for an accused in any criminal matter, whichever shall occur first, a judge or other designated official of the circuit court in which the matter is pending, shall set a date for the trial of the case, which date shall be *not later than 180 days from the date of the arraignment of the person accused or the appearance or the appointment of counsel for the accused whichever occurs first.* The date established for the trial of the matter shall not be postponed except for good cause shown by the moving party and only with the permission of the administrative judge of the court where the matter is pending.

the trial court no longer had any jurisdiction. Secondly, he claimed that the administrative judge did not grant the postponement as required by the rule.

Both Art. 27, § 591 and former Rule 746 provide that trial shall be set within 180 days after the earlier of the appearance of counsel or the first appearance of the defendant before *the* circuit court. The statute and rule also provide that, for good cause shown, *the* County Administrative Judge may grant a change of a circuit court trial date.

 In our view the rule is simply inapplicable here where at Grandison's request the case was removed to the Circuit Court for Somerset County less than a month before the January 3, 1984 trial date set in the Circuit Court for Baltimore County. This is readily understandable since the statute and rule only address the situation where a case is set and ultimately tried in a *single* circuit court, and not where a trial date has been set in one circuit court but the case has been removed to a different circuit court for trial. Indeed, to conclude that Art. 27, § 591 and former Rule 746 similarly cover removal situations would be to render useless and ineffective the principal requirement contemplated by the statute and rule. Judge Eldridge, speaking for the Court in *State v. Frazier*, 298 Md. 422, 453, 470 A.2d 1269 (1984), stated:

> "The major safeguard contemplated by the statute and rule, for assuring that criminal trials are not needlessly postponed beyond the 180-day period, is the requirement that the administrative judge or his designee, rather than any judge, order the postponement. This is a logical safeguard, as it is the administrative judge who has an overall view of the court's business, who is responsible 'for the administration of the court,' who assigns trial judges, who 'supervises the assignment of actions for trial,' who supervises the court personnel involved in the assignment of cases, and who receives reports from such personnel." (footnotes omitted).

Clearly then former Rule 746 was not designed to cover the removal situation. In such a situation, the administrative judge of the circuit court from which the case was removed would be unable to fulfill those functions contemplated by the statute and rule. *Id.* Similarly, to expect and require that the receiving court adhere to the trial schedule set forth in the former circuit court would be to bestow upon the administrative judge of the receiving court an unreasonable burden which oftentimes could result in an impossible task. Understandably, this was recognized by the trial judge in Somerset County who, in denying Grandison's motion to dismiss, stated in part:

"Obviously, when you ask for removal like that, you automatically extend the trial date. There is no way in this county we could have tried it on the 3rd of January. No. 1, we only had 12 days because of the Christmas holiday and weekends and New Year's holiday, and we have the problem of cancelling out four or five months of cases that had already been scheduled to be tried. We only have one judge and one courtroom in this county, so it became necessary to continue the trial date at the request of the defendant."[9]

We hold therefore that when a criminal case is removed on a defendant's request, the trial date assigned in the forwarding circuit court pursuant to Art. 27, § 591 and present Rule 4–271 is without effect. We further hold that under such conditions the 180-day period begins to run anew in the receiving circuit court from the time the case is received therein. A defendant also remains protected by his speedy trial rights under the federal and state constitutions.

We also point out that this holding is equally applicable where the State obtains the removal, but with some limitation. If it appears that such removal was for the

9. The record does not reflect that Grandison ever asked for a continuance.

purpose of or had the necessary effect of circumventing the requirements of the statute and the rule, the original trial date will hold. *See Curley v. State,* 299 Md. 449, 474 A.2d 502 (1984) (charges refiled following nolle prosequi); *State v. Glenn,* 299 Md. 464, 474 A.2d 509 (1984); and compare *State v. Phillips,* 299 Md. 468, 474 A.2d 512 (1984).

Accordingly, we find no merit to Grandison's contentions on this issue.

## VI

### *Violation of Interstate Agreement on Detainers*

It is next contended that because he was not tried within 120 days of being returned to Maryland, the State violated Maryland Code, Art. 27, § 616E, and thus the indictment against him must be dismissed. Grandison argues that he was brought to the Circuit Court for Baltimore County several times for matters in connection with this case. It appears that at these times he was in federal custody in New York, and upon completion of the hearings on motions and other matters, he was returned to New York by the federal authorities. As this motion was heard by the court on argument without any testimony being taken, the record is not entirely clear. Nevertheless, we glean that whenever it was necessary to have Grandison in attendance at court for matters connected to this case a writ of *habeas corpus ad prosequendum* was obtained and served. Thereupon federal marshals escorted Grandison to court and stayed with him until the court business was completed. Grandison was then escorted back to New York by the federal marshal, where he was being held in a pre-trial detention facility. It also appears that during this period Grandison was not serving a period of incarceration, only pre-trial detention. The trial judge concluded that he was not satisfied that Grandison was "serving a sentence in the Federal Court," that no detainer was filed, and that Grandison never left the custody of the federal marshal. Article 27,

§ 616E(a)[10] contains certain triggering events which, as argued by the State, were not met here. First, there needs to be a detainer which was lodged against Grandison. While the record is less than clear as to what was filed, the trial judge found that it fell short of being a detainer. Second, there is doubt that the requirement in § 616E(a) that Grandison was serving a term of incarceration was met; the trial judge did not think so. Finally, § 616E(a) requires that custody be obtained by the State; it was not here, as noted by the trial judge. We do not believe the trial judge erred; he heard the argument and saw what was presented to him. We find no merit to this contention.

## VII

### *Denial of Request for Further Removal*

■■■ Because of what he perceived as extensive publicity surrounding his case, Grandison requested an additional removal; lacking this, he wanted a continuance; and in the absence of either, he moved to have the jury sequestered. He also sought the impaneling of a new group of jurors. The trial judge denied all of these requests. Grandison now complains that he was denied a fair trial. We disagree. In *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985), we had occasion to address this identical issue when Evans raised it

---

**10.** That section states:

"(a) *Presentation of request.*—The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have the prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with Article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated: provided that the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request: and provided further that there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability either upon his own motion or upon motion of the prisoner."

in the Circuit Court for Worcester County where he was being tried. The reasons cited by Evans are the same, basically, as those cited by Grandison. What Judge Eldridge wrote for the Court there is equally applicable to Grandison's argument here and is dispositive of his contention. Judge Eldridge stated in part:

"We hold that the record supports the decision of the trial judge to deny the request for further removal. We have consistently taken the position that this question is one which rests within the trial court's discretion, reviewable on appeal only to determine whether there has been an abuse of discretion."

*Id.* at 511–12, 499 A.2d at 1273–74 (citations omitted).

Accordingly, we herein conclude that the denial of the request for further removal did not amount to an abuse of discretion under Maryland law.

The same can be said of the trial court's denial of a continuance. It is beyond dispute that the determination of whether to grant a continuance lies within the sound discretion of the trial court. *Id.* at 514, 499 A.2d at 1275. Here, we find no evidence of abuse of that discretion.

■■■ Similarly, the determination to have the jury sequestered throughout the trial is discretionary. Former Md. Rule 751 e (now Md.Rule 4–311(c)); Maryland Code (1974, 1984 Repl.Vol.), Courts and Judicial Proceedings Article, § 8–304; *see Evans*, 304 Md. 487, 499 A.2d 1261 (1985). Here, too, Grandison has failed to provide us with any indication that there was an abuse of discretion. There is no proof of juror prejudice. To the contrary, the jurors received daily admonitions against exposure to publicity.

■■■ Finally, Grandison's contention that a new jury should have been impanelled due to alleged discussions connecting him to the Mafia is completely without merit and foundation in the record. Any possibility of prejudice resulting from those rumors was adequately cured by the trial court's individual questioning of the prospective jurors.

Consequently, there was no abuse of the trial court's discretion here.

## VIII

### *Individual Voir Dire*

 In assessing appellant's contention that the trial judge's voir dire examination of the jury *en masse* was inadequate to protect him from the probability that his defense would be prejudiced due to publicity surrounding the Evans verdict, we begin with the recognized principle that "in the absence of a statute or court rule to the contrary, as long as the selection procedure [of a jury] results in a fair and impartial jury, the method and manner of conducting a voir dire rests within the sound discretion of the trial court." *Evans v. State*, 304 Md. 487, 514, 499 A.2d 1261, 1275 (1985) (quoting *Colvin v. State*, 299 Md. 88, 102, 472 A.2d 953, 960, *cert. denied*, —— U.S. ——, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984)).

At issue here is whether the trial judge abused his discretion as appellant contends in failing to grant appellant's request to *individually* voir dire members of the jury panel as to potential prejudice resulting from the guilty verdict rendered in the Evans trial, which was held in nearby Worcester County.

Appellant has offered no authority, nor has our research uncovered any, mandating that a trial court conduct individual voir dire of each member of the jury after trial has commenced in a capital case where there is an allegation of jury prejudice resulting from publicity of a related, yet separate, trial.[11]

---

11. Former Md.Rule 752 provided:
 "The court may permit the parties to conduct an examination of *prospective* jurors or may itself conduct the examination. If the court conducts the examination, it shall permit the parties to supplement the examination by any further inquiry it deems proper or shall itself submit to the prospective jurors the additional questions proposed by the parties it deems proper." (Emphasis added).

Nonetheless, several related principles of law exist which in our analysis force us to conclude that appellant's argument must fail.

To support his contention, appellant relies in part on *Silverthorne v. United States,* 400 F.2d 627 (9th Cir.1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971), for the proposition that in some instances where a significant potential for prejudice has been found, individual voir dire of the jurors is *required.* We decline to analyze the merits of such a contention as we find the case *sub judice* factually distinguishable to *Silverthorne.*

In *Silverthorne* the appellant argued that the trial court committed reversible error in failing to ascertain during voir dire and at certain specific points in the trial whether, in light of the *massive* news media publicity which antedated and which was contemporaneous with the trial, the jurors bore any prejudice toward appellant. 400 F.2d at 630. In analyzing the particular situation, the United States Court of Appeals noted that during the trial some jurors, while sitting in the jury room, read the newspaper accounts of appellant's trial; indeed, one particular juror maintained a comprehensive collection of newspaper articles pertaining to appellant's trial. *Id.* at 641. Though these facts were brought to the attention of the trial judge during the trial, he nonetheless failed to inquire as to the possible influence of the articles or further attempt to remedy the situation.

In holding that the trial court erred, the Circuit Court of Appeals stated, "[W]e have no recourse, in light of this incident, but to ... attribute little if any weight to the court's repetitive admonitions that the jurors should read or hear nothing about the case." *Id.* at 641. Relying in part on *Coppedge v. United States,* 106 U.S.App.D.C. 275, 272 F.2d 504, 508 (1959), *cert. denied,* 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961), the court noted, "It is ... the affirmative duty of the trial court to take positive action to ascertain the existence of improper influences on the jurors'

deliberative qualifications and to take whatever steps are necessary to diminish or eradicate such improprieties." *Silverthorne,* 400 F.2d at 643.

We find the significant fact existing in *Silverthorne,* knowledge on the part of the trial court of blatant violations by members of the jury of the trial court's admonitions, not to be present in the case at bar. Further, in the case at bar, there is no evidence on record of *massive* publicity surrounding *appellant's* trial but only allegations of the existence of publicity surrounding the related but separate Evans trial.

In *Coppedge,* the United States Court of Appeals for the District of Columbia Circuit reversed the conviction of a criminal defendant on the basis that the trial court failed to ascertain the possible effect of trial publicity on members of the jury. Particularly, the trial court was found to have allowed the jury to twice separate overnight without admonishing the jurors against reading newspaper articles about the pending trial. Further, the trial court failed to inquire into the potential prejudice harbored by those jurors the trial court *knew* had read newspaper accounts of the proceedings. This was held to constitute error on the part of the trial court. In the case *sub judice,* the trial court specifically admonished the jurors not to expose themselves to media publicity; further, there is no evidence in the record that suggests the trial court had knowledge that any member or members of the jury had violated its admonition. *See also Adjmi v. United States,* 346 F.2d 654 (5th Cir. 1965).

Turning to the instant appeal, it must be borne in mind that the record suggests the trial judge was extremely sensitive to and concerned with the potential problems raised by media publicity and was quite aware of the necessity of specifically calling to the attention of the jurors the importance of avoiding it. On the evening of May 2, 1984, the trial judge warned the newly selected jurors:

"Now, the admonishment I am going to give you now will be true throughout these proceedings. Please don't discuss this matter with anyone at all. Don't discuss it amongst yourselves, and don't discuss it with your friends or your neighbors or your wives or husbands, as the case may be, or your children, or with the press.

As I said a couple times before, I know when you are playing an important part in a proceeding like this, it is difficult sometimes to avoid reading a newspaper account of it or watching a television account of it or something like that. I know it is hard not to do that. But I am going to ask you, you are going to have to refrain from doing it in this case if you are going to be fair to both parties.

You are under oath to be fair to both parties. Don't watch any television account or listen to any radio account of these proceedings until this case is terminated. Don't read anything in the newspaper about it, please, until this case is terminated."

The next morning the trial judge reiterated the admonition. He again reminded the jurors during the course of the trial.

Additionally, on the morning of May 9, the morning after co-conspirator Evans was convicted in Worcester County, upon request of the appellant-Grandison, the trial judge posed the following question to the jury *en masse:*

"Have any of you heard anything about the outcome of a case that was concluded in Worcester County last night? If you have, please stand."

There was no response by any member of the jury.

██ Based on our review of the record, we are not persuaded that the trial judge erred in questioning the jury *en masse* as to the alleged publicity surrounding the Evans trial.[12] Appellate courts should be slow to impute to juries

---

12. Each case must rest on its "special facts." *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

a disregard of their duties and to trial courts a want of diligence or perspicacity in appraising the jury's conduct. *Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439 (1933). It is mere speculation, unsupported by the record, to conclude that there were jurors who became overwhelmingly influenced by publicity surrounding a different trial and yet did not choose to acknowledge these feelings before their fellow jurors. Manifestly, Grandison has not demonstrated that he has been afforded anything less than a fair and impartial jury.

Under the circumstances presented by the instant case, we are not persuaded that the trial judge erred in conducting the requested voir dire concerning publicity surrounding the Evans conviction *en masse*.

## IX

*Exclusion for Cause of Jury Panel Members Who Expressed General Objections to the Death Penalty*

■ Grandison next contends that of the twenty six prospective jurors who expressed some hesitation about imposing the death penalty, all but three were excused for cause. He argues that it is clear that the court improperly struck these jurors because their beliefs were not such as to prevent them from rendering an impartial verdict. The State, on the other hand, contends there was no error by the trial judge. We have carefully reviewed the record and agree with the State's position.

The Court has recently been confronted with two death penalty cases in which the same basic argument was made as is now presented by Grandison; in both cases we rejected that argument and do so here. See *Foster v. State*, 304 Md. 439, 499 A.2d 1236 (1985) and *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985). The only variation in Grandison's argument stems from *Wainwright v. Witt*, 469 U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), wherein the Supreme Court modified the standard for determining when a prospective juror may be excluded for cause because of

his or her views on capital punishment.[13] The Court stated, "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.*, —— U.S. at ——, 105 S.Ct. at 852, 83 L.Ed.2d at 851–52 (quoting *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). After reviewing the record we are satisfied that where the trial judge excused a prospective juror for cause he followed the standard set out in *Witt.* In reaching this conclusion we recognize that deference must be given to the trial judge's decision to exclude. In *Witt,* in pertinent part, the Supreme Court stated:

"We note that, in addition to dispensing with Witherspoon's reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror." —— U.S. at ——, 105 S.Ct. at 852–53, 83 L.Ed.2d at 852–53 (footnote omitted).

---

**13.** *See also Darden v. Wainwright,* 767 F.2d 752 (11th Cir.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 21, 87 L.Ed.2d 699 (1985), argued January 13, 1986.

In our view, Judge Simpkins was painstakingly thorough in the questioning of prospective jurors, particularly those who obviously had problems with the death penalty in general. Furthermore, the trial judge afforded Grandison, his standby attorney, and the State's attorney ample opportunity to question the prospective jurors. In short, we are satisfied that the entire procedure was carefully executed in an effort to obtain a fair and impartial jury both as to the defendant and to the State.

## X

### *Failure to Strike for Cause Jurors Who Indicated Potential Inability to be Impartial*

■■■ Grandison also argues that the trial judge erred in refusing to strike for cause six prospective jurors whose ability to be impartial was "drawn into serious question" because of their aversion to drugs and drug trafficking.

A defendant is, of course, entitled to a fair and impartial jury. What Grandison overlooks, however, is the fact that all six of the prospective jurors he claims should have been struck were rehabilitated through additional questioning. For example, Mrs. Creasy, who admitted she had heard the case was a drug-related case also stated several times she thought she could base her decision on the evidence she heard in the courtroom and the law involved. Mrs. Dorsey disliked drugs; she was asked the following question by Grandison's standby counsel:

"MR. CRAWFORD: Could I ask you one more question? I am sorry. Getting back to this drug business, if something came out in trial to indicate that there were drugs involved, and although this man is not on trial for any drug involvement, if it should develop during the course of the trial that there may have been some drug involvement, although he is not on trial for that, would that have any—make any difference to you as to how you arrived at a verdict regarding what he is on trial for?

MRS. DORSEY: No, if it wasn't pertinent to the case. Like I said, I just don't like drugs. I had an experience in drugs with my son, and he is well, thank God. I just don't like drugs."

Thus it is clear that Mrs. Dorsey was stating, in effect, that the drug factor would make no difference in how she arrived at a verdict if the case did not involve drug charges. Mrs. Hankins also stated that she would try her very best to make a decision based on the evidence and the law. Mrs. Somers stated she would not make a decision on the fact of drugs alone and that her decision would be based on the evidence and the law. Finally, both Mr. Brimer and Mr. Serman testified that while drugs might influence them, they would follow the court's instructions to base their decisions on the evidence and the law. Thus while unremarkably all expressed an aversion to drugs, all stated they would make a decision based on the evidence and the law. In our view Grandison was entitled to no more.

## XI

### Death Qualified Jury

Grandison next contends that he was entitled to be tried by a jury from which opponents to the death penalty were not excluded. We recently had occasion to address this contention in *Foster v. State,* 304 Md. 439, 499 A.2d 1236 (1985). For the reasons set forth in Part IB of the *Foster* opinion, 304 Md. at 453, 499 A.2d at 1243, we again reject this contention.

## XII

### Evidence

Here, certain evidence is argued to have been erroneously admitted at trial. That evidence consists of, namely: (a) testimony of Cheryl Piechowicz concerning her husband and sister; (b) photographs of the victims taken before the incident occurred; (c) photographs taken at the autopsy of each victim; (d) testimony of Cheryl concerning her conver-

sation with Janet Moore; (e) a MAC–11 pistol; and (f) an enlargement of Grandison's March 14 letter to Moore.

(a)

■■ During the guilt or innocence phase of the trial, Cheryl Piechowicz testified, *inter alia*, to certain facts about her sister and husband.[14] Objection to this testimony on the grounds of relevancy was overruled. We perceive no error on the part of the trial judge in so ruling.

In *Johnson v. State*, 292 Md. 405, 430, 439 A.2d 542, 556 (1982), holding that the trial judge did not err in permitting testimony that the victim had a very sick daughter, we stated:

"Assuming, solely arguendo, that this testimony was superfluous to the prosecution's case, a reversal of the underlying convictions is not justified if the evidentiary violation constitutes harmless error. The standard for determining harmless error, as thoughtfully laid out by Judge O'Donnell for this Court in *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976), is whether 'a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict. . . .' Upon such a review of the trial record in this case we have no difficulty in declaring beyond a reasonable doubt that the verdicts were not influenced by the testimony concerning the daughter's health. The record is glutted with overwhelming evidence in support of the jury's guilt determinations. . . . A reversal on this basis is thus not warranted."

We find these principles applicable here and dispositive of this contention.

---

**14.** Generally, that her relationship with her sister, Susan, was perfect; that her sister was a good student, sports-oriented, and engaged to be married. She also testified she was deeply in love with her husband, Scott.

(b) & (c)

██ During Cheryl's testimony, two color photographs were introduced; one, a high school portrait of Susan Kennedy (State's Exhibit # 1), the other, the Piechowiczes at the beach (State's Exhibit # 2).[15] Whether a photograph is of practical value in a case and admissible at trial is a matter best left to the sound discretion of the trial judge. *Johnson v. State,* 303 Md. 487, 502, 495 A.2d 1, 8, *cert. denied,* —— U.S. ——, 106 S.Ct. 868, 88 L.Ed.2d 907 (1985). Ordinarily a court's determination as to the admissibility at trial of photographs will not be disturbed unless plainly arbitrary. *See Bowers v. State,* 298 Md. 115, 135–36, 468 A.2d 101, 111–12 (1983).

Considering first the photographs identified as State's Exhibits 1 and 2, we perceive no arbitrariness on the part of the trial court in ruling those exhibits admissible. The photograph of Kennedy was relevant to illustrate the similarity the victim bore to her sister, Cheryl Piechowicz. As to the family photograph of the Piechowiczes, we fail to see any prejudicial error in admitting it, particularly in light of the overwhelming evidence against the accused.

██ Two black and white photographs, one of each victim, marked State's Exhibits 23 and 24, are also contested as erroneously admitted. The photographs were taken in connection with the medical examiner's autopsy report on each victim. We conclude it was not error to admit these photographs.

Not only is the admissibility of such evidence clearly within the trial court's sound discretion, *Johnson,* 303 Md. at 503, 495 A.2d at 9,[16] but we have had occasion to

---

**15.** The family photograph pictured the daughter of Scott and Cheryl as well. Her image was blackened out by the court prior to its release to the jury.

**16.** *See also,* Maryland Code (1982), Health-General Article, § 5–311(d), which states:

"*§ 5–311. Records.*

recognize as proper the exercise of such discretion in receiving into evidence at trial photographs depicting the condition of the victim and location of injuries upon the deceased, *Clarke v. State,* 238 Md. 11, 21–22, 207 A.2d 456, 461–62 (1965) and the wounds of the victim, *Madison v. State,* 200 Md. 1, 7–8, 87 A.2d 593, 595 (1952).

Nor are the particular photographs inflammatory to the jury solely on the basis that they do not represent any issue in controversy. Further, since the photographs are mere graphic representations of undisputed facts already in evidence, their introduction could not be held to have injured the accused. *See, e.g., Smith v. State,* 182 Md. 176, 187, 32 A.2d 863, 867 (1943).

(d)

Cheryl Piechowicz testified over objection that she conversed with co-conspirator Moore at the federal courthouse on March 14, 1983, while appellant's federal drug trial was there pending. An objection to the substance of the conversation was sustained on grounds of hearsay. However, Cheryl was permitted to testify that a conversation had taken place and that Moore had "scared her." Also, Cheryl successfully identified a photograph of Moore. Although not clear from his brief, appellant's argument seems to be that the admission of Cheryl's testimony concerning her conversation with Moore was erroneous since it had no relevance to the proceedings. We disagree.

As a preliminary matter, we note that appellant's contention that Cheryl's admitted testimony was irrelevant

---

(d) Evidence.—(1) In this subsection, "record";

(i) Means the result of a view or examination of or an autopsy on a body; and

(ii) Does not include a statement of a witness or other individual.

(2) A record of the office of the Chief Medical Examiner or any deputy medical examiner, if made by the medical examiner or by anyone under the medical examiner's direct supervision or control, or a certified transcript of that record, is competent evidence in any court in this State of the matters and facts contained in it."

was not preserved for appeal, and is therefore waived. Where specific grounds are delineated for an objection, the one objecting will be held to those grounds and will ordinarily be deemed to have waived grounds not specified. *Thomas v. State,* 301 Md. 294, 328, 483 A.2d 6, 23 (1984). Since Grandison specifically objected to the testimony on hearsay grounds at trial, our review is limited to that issue.

 Despite the fact that the trial judge sustained Grandison's hearsay objection, the court maintained discretion to allow introduction of evidence as to the existence of the Moore conversation and its effect on Cheryl. A trial judge has broad discretion to determine whether evidence will be sufficiently helpful to the jury to justify an excursion into the subject. *Stebbing v. State,* 299 Md. 331, 350, 473 A.2d 903, 912, *cert. denied,* —— U.S. ——, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Here, Moore was alleged to be part of the conspiracy; Cheryl's testimony was relevant to illustrate that Moore acted in a manner supportive of Grandison at the time of the federal hearings to frighten a crucial identification witness.

### (e)

 The trial court similarly did not err in admitting State's Exhibit 14, a MAC–11 pistol, into evidence.

Testimony adduced at trial revealed that State's Exhibit 14 looked like the weapon that changed hands between Kelly and Evans and was seen by Charlene Sparrow. Additionally, a weapons expert concluded at trial that the pistol he identified as a MAC–11 was the only type of firearm that could have discharged the bullets and ejected the particular cartridges found at the scene. Finally, the jury was told that the actual weapon that fired the fatal shots had never been found.

In light of this testimony, we perceive no error in the admission of State's Exhibit 14. We were presented with this precise issue in *Evans v. State.* Our discussion there is dispositive of Grandison's present argument. Citing C.

McCormick, Evidence § 213 (3d ed. 1984), at 670, we held that the trial judge did not commit an abuse of discretion in admitting into evidence a MAC–11 machine pistol as a weapon representative of that allegedly used in the slaying. *Evans*, 304 Md. at 520–21, 499 A.2d at 1278. In the case *sub judice*, not only was the proffered exhibit relevant and material, it was clearly an important part of the State's case in its attempt to link the weapon offered to Evans on the day prior to the murders to the weapon used to commit the murders. Thus, we conclude the trial judge did not err in admitting State's Exhibit 14 as there was ample evidence of similarity between it and the weapon used.

(f)

Finally, appellant argues that an enlarged facsimile (State's Exhibit 45) of an original letter (State's Exhibit 44) written by appellant to Moore, dated March 14, 1983, had the prejudicial effect of overemphasizing a single piece of evidence over all others. We cannot agree.

The enlargement of the letter was identified and received into evidence during direct examination of Mr. Senter, a document examiner for the F.B.I. Though unclear from the record, appellant seemed to object to the display of the enlargement since it was shown to the jury prior to its admission into evidence. Whether the display overemphasized that piece of evidence was not questioned by appellant at trial. *See Thomas*, 301 Md. 294, 483 A.2d 6.

Nevertheless, we find no error on the part of the trial court in allowing State's Exhibit 45 to be admitted; nor do we feel the appellant was prejudiced by the display of that exhibit prior to its formal admission into evidence. First, the original letter was already in evidence; its admissibility was not challenged on appeal. Second, testimony revealed that the enlargement was an exact, although enlarged, copy of the original. Finally, the enlargement was employed to demonstrate to the jury the basis for witness Senter's conclusion that the original letter was indeed authored, drafted, and signed by Grandison.

In analyzing such evidence, it is the statement itself which has substantive legal significance. The means by which the statement is recreated as evidence before the jury is of secondary import, provided that its authenticity is reasonably assured. *Colbert v. State,* 37 Md.App. 383, 387, 377 A.2d 585, 588 (1977). Accordingly, we hold there was no error in the display or the admission of State's Exhibit 45.

## XIII

### *Admission of Hearsay Evidence Under The Co-conspirator Exception*

Grandison next argues that the trial judge erred in allowing the admission of hearsay evidence under the co-conspirator exception to the hearsay rule. This is so, he argues, because the State had not proven the existence of a conspiracy by independent proof showing his participation therein. Furthermore, he argues that several of the statements related to matters not within the scope of the conspiracy and several statements were made by someone not alleged to be part of a conspiracy. After reviewing the record we perceive no merit to Grandison's contentions.

Grandison concedes that out of court declarations of one conspirator made during the course of and in furtherance of the conspiracy are admissible against a co-conspirator as an exception to the hearsay rule. *See Greenwald v. State,* 221 Md. 245, 157 A.2d 119, *appeal dismissed,* 363 U.S. 721, 80 S.Ct. 1599, 4 L.Ed.2d 1521 (1960). What Grandison seems to argue is that before this hearsay exception is available, there must be a prima facie showing of the existence of a conspiracy and his participation therein.

To the contrary, it is not necessary that a conspiracy be conclusively established *before* the declarations are admissible. Flexibility in the order of proof is allowed. *Greenwald,* 221 Md. at 257, 157 A.2d at 126; *see Hill v. State,* 231 Md. 458, 461, 190 A.2d 795, 796, *cert. denied,* 375 U.S. 861, 84 S.Ct. 127, 11 L.Ed.2d 87 (1963); *Mason, Taylor*

*and Taylor v. State,* 18 Md.App. 130, 137, 305 A.2d 492, 497 (1973).

■ In the instant case, we have reviewed the record and are persuaded that there was ample evidence presented, independent of the challenged hearsay statements, of the existence of a conspiracy to justify the trial court's application of this hearsay exception. For example, Grandison's letter of March 14 to Janet Moore telling her to take "Short" (Evans) to see Rodney (Kelly) to take care of something to do with his upcoming trial; the evidence of Evans' and Moore's visit thereafter with Grandison in the City Jail; and Theresa Purdie's testimony that Evans, Moore, and Kelly all spoke to Grandison over her phone about protective glass at a motel. In addition, Calvin Harper testified that Kelly took a gun to show to Evans and the next day Kelly left with the gun and returned without it. There was also testimony to the effect that Kelly got $500.00 from a Michael Queen, which apparently was used to obtain the gun.

It is settled that not much in the way of independent evidence is needed to show the existence of a conspiracy and an accused's involvement therein. *See Brown v. State,* 281 Md. 241, 378 A.2d 1104 (1977). In our view the independent evidence in this case was sufficient.

Finally, Grandison contends that there was one instance of double hearsay which did not fall within the co-conspirator exception and that another statement could not be said to be in furtherance of the conspiracy. Furthermore, he complains that one statement that Grandison told Purdie— she should deny knowing Charlene Sparrow—was made after the conspiracy had ended. We find no merit in these contentions.

## XIV

### *Reference to Federal Case*

■ Appellant also objected to the introduction of evidence relating to a federal charge against him pending at

the time of commission of the homicides in the case *sub judice*. The admissibility of this evidence forms the basis for Grandison's next argument.

The State maintains that evidence of appellant's pending federal charge was relevant to show his motive for arranging the murders and thus admissible. We agree.

The record reveals that at no time during the proceedings below did the State reveal or attempt to reveal the nature of the pending federal charge against the appellant, its result, or details related to it. The references made to the federal charge only stated that there existed a federal charge against Grandison for which the prosecution had to prove he occupied a particular room at the Warren House Motor Hotel in November of 1982.

It is elementary that evidence of a defendant's prior criminal acts may not be introduced to prove that he is guilty of the offense for which he is on trial. *Straughn v. State*, 297 Md. 329, 333, 465 A.2d 1166, 1169 (1983). We applied this rule, commonly referred to as the "other crimes rule," in *Ross v. State*, 276 Md. 664, 669, 350 A.2d 680, 684 (1976), where we said:

> "[E]vidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible." (Citations omitted).

However, the exceptions to this rule are equally well-recognized and virtually as prominent as the rule itself. *McKnight v. State*, 280 Md. 604,. 613, 375 A.2d 551, 556 (1977).[17] *See* C. McCormick, Evidence § 190 (3d ed.1984).

---

**17.** Evidence of other crimes is independently relevant and thus admissible if introduced to prove or establish:

> "(1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of a crime on trial."

*Ross*, 276 Md. at 669–70, 350 A.2d at 684 (citations omitted).

The admissibility of the challenged evidence must be determined through recognition of this rule and, more particularly, application of its exceptions.

We conclude that the scintilla of evidence admitted relating to appellant's federal charge was relevant to establish appellant's motive for arranging the murders. Thus, the evidence does not fall prey to the rule of exclusion enunciated above. As our cases make clear, that rule will act as a bar to other crimes evidence *unless* the evidence is "substantially relevant for *some other purpose* than to show a probability that [the accused] committed the crime on trial because he is a man of criminal character." *Ross*, 276 Md. at 669, 350 A.2d at 684 (quoting McCormick, *supra*) (emphasis supplied).

Thus, the trial court did not err. *See Straughn*, 297 Md. at 333–34, 465 A.2d at 1169 (trial court has broad discretion in admitting other crimes evidence); McCormick, *supra.* Evidence of the *existence* of appellant's pending federal charge was relevant to illustrate his motive for arranging the murders; it demonstrated a logical connection between the crucial defense witnesses, the Piechowiczes, and the subsequent homicides. Further, the fact that the State proffered no evidence *other than* the existence of the pending federal charge renders any potential prejudice to Grandison minimal in light of its probative value. 297 Md. at 333–34, 465 A.2d at 1169.

## XV

### *Erroneous Admission of Hearsay Evidence Resulting in Prejudice*

During the State's case-in-chief, one James Savage, the prosecutor in the federal drug trial against Grandison, was permitted to testify that Scott Piechowicz had provided the federal authorities certain evidence against Grandison. The tenor of this evidence was to show that despite the fact that Piechowicz could not make a positive identification of Grandison, he could help establish that Grandison had occu-

pied a room at the Warren Motel at a time critical to the federal prosecution. Piechowicz had related to Savage that he had seen a ticket on an individual's belt indicating that the individual had been to the Sugar Ray Leonard benefit. Apparently, this ticket was found in the room occupied by Grandison.

We find no error in the trial court's refusal to preclude Savage, testifying as a State witness, from relating this evidence. Grandison complained at the instant trial that his right of confrontation was violated and the evidence was hearsay. This argument is meritless. Hearsay was not involved as these extrajudicial statements were not being offered for their truth. *Lunsford v. Bd. of Education of Prince George's County,* 280 Md. 665, 374 A.2d 1162 (1977); *McCall's Ferry Co. v. Price,* 108 Md. 96, 69 A. 832 (1908); *Sun Cab Co. v. Walston,* 15 Md.App. 113, 289 A.2d 804 (1972), *aff'd on other grounds,* 267 Md. 559, 298 A.2d 391 (1973). Through Savage, the State sought to establish a motive for the murder of Scott Piechowicz. Thus, the veracity of Piechowicz's statements to Savage was of no import. The mere fact that they were made supplied a motive for the Piechowicz killing. At the instant trial, Savage was under oath and available for cross-examination as to whether Piechowicz actually made the statements. Hence, his testimony was admissible.

A second ground for complaint arose when the State, in cross-examining Detective Duckworth, elicited certain alleged hearsay not within any of the recognized exceptions to the rule. Duckworth, an investigating officer in the murder case, had been called by the defense to show that Scott Piechowicz had been summoned to testify in an unrelated case. Through this testimony the defense hoped to show that someone else besides Grandison had a motive to murder Scott Piechowicz. Grandison elicited this testimony from Duckworth on direct examination without objection by the State.

On cross-examination the State sought to establish the nature of the dispute precipitating the second summons. Without objection, Detective Duckworth testified that his investigation of the summons had revealed that Piechowicz and one Eric Allen had disagreed over the amount of money Allen owed for a room at the Warren House. This line of questioning proceeded until Duckworth was asked if he had interviewed Mr. Allen. At this point, Grandison objected stating, "All this is hearsay."

This objection was properly overruled because quite simply the question to which the hearsay objection was directed was not one involving hearsay. Duckworth knew of his own knowledge whether he had interviewed Mr. Allen. Thus, the question was clearly proper. Further, this line of inquiry had been initiated by Grandison, and the State was certainly privileged to develop the issue on cross-examination. *See Culler v. Standard Oil Co.*, 127 Md. 405, 96 A. 558 (1916); *see also Walters v. State*, 156 Md. 240, 144 A. 252 (1929); *Koogle v. Cline*, 110 Md. 587, 73 A. 672 (1909).

 ˙The final testimonial complaint occurred when appellant recalled James Savage to testify that a person named Anthony Garrison had registered for the hotel room at issue in the federal trial and that Garrison and Grandison were different people. On cross-examination the State pursued this line of questioning over objection and elicited certain testimony which Grandison now contends was sufficiently prejudicial to warrant reversal of his conviction. Specifically, the State established that although Anthony Garrison registered for the room, it was Anthony Grandison who occupied it. Further, the federal prosecutor testified over objection that Grandison requested Garrison register for the room and paid him for doing so. He also explained that a showing that Grandison was connected with a particular room at the Warren House Hotel was crucial to convict Grandison on federal drug charges.

The admission of this testimony does not warrant reversal. A review of the record shows that each of these facts,

with the exception of the fact that Garrison received remuneration for registering for the room, was independently established through unobjected to testimony. For instance, Cheryl Piechowicz testified that she had been summoned to appear as a witness in the federal drug trial of Anthony Grandison to make an identification of Grandison as an occupant of a room at the Warren House. In addition, Savage when called as a State's witness stated that the testimony of Scott and Cheryl Piechowicz linking Grandison to a certain room in the Warren House was critical to the federal drug case. Also, in the very colloquy of which Grandison now complains, Savage was permitted to testify, "Mr. Garrison requested the room; Mr. Grandison occupied the room" without objection or a motion to strike by the defense. Finally, on redirect examination by Mr. Grandison, Savage testified that Grandison had a key to the hotel room in his possession when he was arrested on the federal drug charge.

Thus, the only fact established over objection by the complained of testimony was that Garrison was paid by Grandison for registering for the hotel room at issue in the federal drug trial. In light of the collateral nature of this evidence, we fail to see how its admission prejudiced Grandison. Consequently, we find no reversible error.

## XVI

### *Denial of Request to Interview Potential Witness*

Grandison also challenges the propriety of the trial court's refusal to allow him to personally interview a potential defense witness, Rodney Kelly.

Like Grandison, Kelly was considered a substantial security risk. He had already entered an *Alford*[18] plea to the crime of conspiracy to murder Scott Piechowicz and Susan Kennedy. As a result of his plea, Kelly had received a

---

18. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

state sentence of fifty years. He also had received a federal life sentence for the same acts. At the time of the Grandison trial, Kelly was incarcerated in federal prison in Lewisburg, Pennsylvania. While in confinement he had allegedly committed another murder, and those charges were pending.

At the onset it must be noted that the court did not unequivocally deny the defense access to the potential witness. The trial judge offered to make Kelly available if the defense wanted to interview him through standby counsel. Grandison, however, declined to avail himself of this opportunity.

The propriety of the trial court's ruling denying Grandison personal contact with the prospective defense witness raises a question not heretofore dispositively addressed by this Court. However, dicta in *Kardy v. Shook*, 237 Md. 524, 541, 207 A.2d 83, 92 (1965), indicates that a defendant and his counsel are at perfect liberty to interview and interrogate prospective witnesses, subject to the witnesses' acquiescence in such interrogations.

The Court of Special Appeals has twice discussed this issue. In *Barnett v. State*, 8 Md.App. 35, 42, 257 A.2d 466, 470 (1969), the intermediate appellate court noted that there are no property rights in witnesses; each party may interview the other's witnesses to ascertain facts within that witness' knowledge. Subsequently, that court suggested that under certain circumstances the denial of a defense request to interview a prospective witness would not entitle the defendant to a mistrial. *Johnson v. State*, 18 Md.App. 571, 576, 308 A.2d 426, 429 (1973).

■ It is our opinion that the circumstances under which a defendant can conduct a pretrial interview of a prospective witness are a matter best left to the trial court's discretion. Here, we find no abuse of that discretion. In the instant case we are not confronted with a complete denial of an opportunity to ascertain facts within the potential witness' knowledge. To the contrary, Grandison was at

perfect liberty to do so through standby counsel. Further, he was not compelled to prepare his defense without prior knowledge of the potential significance and thrust of Kelly's testimony. The two men had had substantial contact throughout the earlier federal proceedings.

In effect, the trial court placed a condition on the interview—a condition with which Grandison was not willing to comply. Other jurisdictions vary on the propriety of such conditions. *See* Annot., 14 A.L.R.3d 652 (1967). The better view is to permit the trial judge to place certain limitations and restrictions on a party's access to potential witnesses if in the court's discretion such restrictions are reasonably necessary for the protection of the witness or for security purposes. *See State v. Gress*, 210 Kan. 850, 504 P.2d 256 (1972); *Commonwealth v. Balliro*, 349 Mass. 505, 209 N.E.2d 308 (1965); *State v. Balsavich*, 113 N.H. 53, 300 A.2d 521 (1973); *Holladay v. State*, 130 Tex.Cr. 591, 95 S.W.2d 119 (1936).

Under the circumstances of this case, we find Judge Simpkins' ruling was reasonable. Clearly, the trial court's apprehension over allowing these co-conspirators to confer in private was well-founded. Both men were in custody and considered extremely dangerous. To maintain security, the trial judge requested the interview be conducted through standby counsel. It was the decision of Mr. Grandison not to do so. Hence, no interview of Kelly was ever conducted. In fact Kelly was never called as a witness for reasons discussed at section XVII, *infra*, which have nothing to do with this alleged denial of a pretrial interview.

Furthermore, Grandison was not prejudiced by the trial court's refusal to allow him direct contact with Kelly. By Grandison's own admission, Kelly had been in his presence throughout the federal trial. Consequently, he had ample opportunity to ascertain the tenor of Kelly's potential testimony. Moreover, Grandison never proffered the contents of the testimony to be elicited from Kelly. In light of these factors, no showing of prejudice has been made. Thus this

Court cannot now say that the trial judge's refusal to grant Grandison the requested interview amounted to an abuse of discretion.

Accordingly, we find no reversible error here.

## XVII

### *Admission of Evidence of an Alford Plea*

▇▇ Grandison complains that the trial judge erred in ruling that if Rodney Kelly was called as a witness for the defense, the State would be allowed to cross-examine him on his *Alford, supra* note 18, plea for impeachment purposes. The plea was offered and apparently accepted to a charge of conspiracy. Grandison argues there was no admission of guilt, nor indeed a finding thereof.[19]

The State points out that there is nothing for us to review as Kelly did not testify, and no proffer was made of what his testimony would have been. We agree. In the absence of a proffer, we are unable to determine whether this ruling prejudiced Grandison's case. As Judge Eldridge pointed out in his concurring opinion in *Johnson v. State*, 303 Md. 487, 495 A.2d 1, *cert. denied*, —— U.S. ——, 106 S.Ct. 868, 88 L.Ed.2d 907 (1985):

> "Nevertheless, assuming that the issue can be preserved by a pre-trial motion, it is settled that whenever one is complaining about a trial court's refusal to admit certain testimony, it is necessary that there be a proffer of what the evidence would have been. *Mack v. State*, 300 Md. 583, 603, 479 A.2d 1344 (1984); *Hooten v. Kenneth B. Mumaw P. & H. Co.*, 271 Md. 565, 571, 318 A.2d 514 (1974); *Keys v. Keys*, 251 Md. 247, 250, 247 A.2d 282 (1968)."

---

**19.** The State argues that indeed there was a finding of guilt. It is abundantly clear from the record that Kelly entered a guilty plea which was accepted. The proper acceptance of an *Alford* type guilty plea results in a valid conviction. See *Hudson v. State*, 286 Md. 569, 409 A.2d 692 (1979) and *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

At no time in the present case did Grandison make any proffer or make any showing on the record of the nature of the actual testimony which he desired to elicit from Kelly. Accordingly, there is nothing for us to review.

## XVIII

*Grand Jury Testimony of Gwen Farmer*

Next at issue is whether the appellant was denied a fair trial because the trial court refused to either admit the grand jury testimony of Gwen Farmer or grant a postponement to allow the defense to locate her. We are unable to conclude that the trial court erred under the facts herein presented.

At the outset we note that the transcript of the grand jury testimony was not marked for identification and does not appear in the record. A portion of it, however, was read to the trial court outside the hearing of the jury.

Farmer had testified before the Federal Grand Jury on May 20, 1983 that Kelly had not driven her car on the night of April 28, 1983. She testified that she had had her car at work during the day and at approximately 5:00 had gone to Kelly's mother's house. Appellant proffered that Farmer would testify consistently with her grand jury testimony and contradict the State's witnesses on material points relating to the use of her car.

Appellant contends that Farmer's Federal Grand Jury testimony should have been admitted below since the testimony was relevant, given under oath, bore persuasive assurances of trustworthiness, and Farmer was unavailable.

The State, however, contends that the transcript of Farmer's testimony did not qualify for admission as former testimony since that testimony, given during an early, exploratory phase of the investigation, was not elicited with the same motivation that would attend cross-examination by the State prosecutor had Ms. Farmer testified at trial.

▇▇ The general rule surrounding the admissibility of former testimony requires that such testimony must have been given by a witness under oath, presently unavailable, and in a proceeding addressed to substantially the same issues as in the current proceeding. Further, there must have been reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant by the party against whom the testimony is now being offered. *Crawford v. State*, 282 Md. 210, 214–15, 383 A.2d 1097, 1100 (1978); C. McCormick, Evidence § 255–258 (2d ed. 1972). See *Commonwealth v. Meech*, 380 Mass. 490, 403 N.E.2d 1174, 1177–78 (1980). Likewise, for former testimony to be admitted at a subsequent trial, there must exist a substantial identity of parties and issues. *Yellow Cab Co. v. Henderson*, 183 Md. 546, 556, 39 A.2d 546, 552 (1944).

▇▇ We do not believe the general rule is satisfied where, as here, Grandison offers the Federal Grand Jury testimony against the State in a subsequent independent criminal proceeding since the State was not a party to nor did it participate in the federal proceedings [20] and thus was not in the position of a cross-examiner at the federal proceedings. Further, the United States' Attorneys, while investigating the matters of the Warren House, would not have been aware of all the facts that developed subsequent to that proceeding. *They* were in no position to examine Farmer to the extent they would have been able to had these facts been known to them, as they were to the State here.

In light of this and the absence of an opportunity for the State to cross-examine Farmer, the trial court did not abuse

---

**20.** Though Grandison, in his brief at trial below, alleges that Mr. Levitz, the State prosecutor, was present during Farmer's testimony before the Federal Grand Jury on September 19, 1983, he neither directs the Court's attention to nor are we able to find evidence in the record necessary to substantiate his allegation. Additionally, assuming *arguendo* that Levitz was indeed present at a federal proceeding, Grandison does not in any manner indicate that an opportunity to examine Farmer was afforded the State.

its discretion in refusing to admit her Federal Grand Jury testimony. In our view, this testimony lacked the persuasive assurances of trustworthiness essential to any hearsay exception.

■ In addition, Grandison at trial sought to introduce Farmer's testimony under former Maryland Rule 740h 1(d).[21] The trial court responded, stating in part,

"Now, the whole thing boils down to whether [the transcript of the grand jury proceeding] is a deposition or not. It is not.

\* \* \* \* \* \*

As I understand the rule, it doesn't apply to this type of situation. I am going to deny your [Grandison's] motion."

The trial judge did not err. Former Rule 740 unequivocally refers to the admissibility and substantive use of depositions. Since the rule was clearly inapplicable it could not serve as the basis for the admission of the transcript of Farmer's Federal Grand Jury testimony.

■ Finally, the trial court did not err in refusing to grant a continuance to appellant so as to allow appellant the opportunity to secure Farmer's presence for trial. The matter was within the trial court's discretion and will not be disturbed absent a showing of abuse prejudicial to the defendant. *Jackson v. State*, 288 Md. 191, 194, 416 A.2d 278, 281 (1980). In light of the fact that Farmer's presence could not be guaranteed by the appellant and since the case

---

**21.** That rule states:
"*Rule 740. Depositions.*
 h. *Use.*
 1. Substantive Evidence.
 At a hearing or trial a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used as substantive evidence if it appears: ... (d) that the witness is absent from the hearing or trial and that the party offering his deposition has been unable to procure his attendance by summons or other reasonable means, unless the absence was procured by the party offering his deposition."

was otherwise ready for the jury, there was no pressing reason for the trial court to further delay submission of the case to the jury.

## XIX

### Failure to Disclose Exculpatory Information

This issue concerns a contention by Grandison that since he had made a pretrial request of the State for *Brady*[22] material in its possession, the trial judge erred in denying his motion to compel the State to turn over to him an FBI report made by an agent who was testifying. It appears that one Janet Bannister had given a statement to federal agents; Bannister was not called as a witness at trial. Grandison, through discovery proceedings in his federal trial, had obtained an edited copy of this statement. It was claimed that Bannister's statement contained exculpatory material in that she referred therein to seeing one Helen Kondilidis in the parking lot at the motel at the time Kondilidis testified she was in the motel lobby and saw Evans shortly before the murders. While there may be merit to Grandison's argument that this material was exculpatory, the agent stated he did not have a copy of the report or the statement. Furthermore, the State's Attorney told the court he did not then, nor did he ever, have this material.

There is no question but that Grandison was entitled to any exculpatory material in the hands of the State or under its control. *See* former Rule 741. However, as the trial judge stated, he could not order the State to turn over something it did not have. In so holding, we observe that Grandison had obtained an edited copy of Bannister's statement through his federal trial and thereby had more evidence than the State.

---

22. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## XX

### *The Request for Data Relevant for Proportionality Review*

 In May of 1984, Grandison's standby counsel filed on his behalf a motion to compel the State to provide Grandison with certain information concerning "homicide statistics." The specific information was as follows:

"(1) The names of all defendants indicted for murder after July 1, 1978, in which aggravating circumstances, as defined in Article 27, Section 413 existed.

(2) As to each defendant so listed, indicate those cases in which the State elected to seek the death penalty.

(3) The disposition of each defendant's case, indicating if dispositions were the result of plea or trial.

(4) The full plea negotiations in those cases in which the State accepted a plea."

As the motion indicates, this information was being sought to support Grandison's motion to dismiss the State's election to seek the death penalty on the basis that such election was unconstitutionally random, arbitrary, and capricious. The trial judge denied the motion believing that the matter was to be dealt with by this Court under its statutorily mandated review of all death penalty cases. While the motion to dismiss appears to be based on allegations of an arbitrary election to seek the death penalty by the State, and there was some argument made to that effect when this present motion was heard, Grandison argues to us that he needed the information in order to prepare an argument on proportionality review. In our view he has abandoned the arbitrary election argument, and we need not address it.

As a practical matter, at the time of the request (after he had been found guilty but prior to his sentencing proceeding) the information sought for proportionality review purposes was not needed by Grandison. Indeed, that information would never be needed until the sentencing proceeding

resulted in the imposition of a death sentence. See *Tichnell v. State*, 297 Md. 432, 468 A.2d 1 (1983) for a thorough discussion of the statutory proportionality review procedure required of this Court.

## XXI

### Motion to Dismiss for Violation of Federal Dual Prosecution Policy

In an apparent response to the concern expressed by the Supreme Court in *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960), over the fairness of multiple prosecutions, the Department of Justice established a policy precluding the initiation or continuation of a federal prosecution following a prior federal or state prosecution based on the same transaction unless there is a compelling interest supporting the subsequent prosecution. *See also Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977). Believing that the present state prosecution is based on the same transaction for which he was prosecuted in the federal courts, Grandison attempts to invoke the federal Department of Justice policy and contends his due process rights have been violated. Without judging the merits of the policy we do not believe it has any relevancy in this state prosecution and thus find no merit to this contention.

## XXII

### Use of the Act Constituting the Offense as an Aggravating Factor

Grandison argues, for the first time, that the finding that he entered into an agreement with Evans to have the Piechowiczs murdered for remuneration[23] could not, standing alone, properly be relied upon to impose the death penalty. He argues that "the act of contracting was the

---

23. Art. 27, § 413(d)(7).

crime itself, hence it could not also be an aggravating factor."

While this issue was not raised in the trial court and we need not address it (see Md. Rule 885), we shall do so in recognition of the seriousness of the case. In *Stebbing v. State,* 299 Md. 331, 358–361, 473 A.2d 903, *cert. denied,* —— U.S. ——, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984), we had occasion to discuss a similar contention made in the context of using an underlying felony as an aggravating factor in a felony murder case in the capital sentencing phase. Judge Rodowsky stated for the Court:

> "Maryland's capital punishment statute, Art. 27, §§ 412–414 makes plain the legislative intent that the commission of certain felonies, underlying a felony murder conviction, is to be considered an aggravating circumstance in the capital sentencing proceeding. At least 30 days prior to trial, the State must notify the accused of its intent to seek a sentence of death and must advise the accused 'of each aggravating circumstance' upon which it intends to rely. § 412(b). Section 413(c)(1) provides that the 'following type of evidence is admissible in [a sentencing] proceeding:
>
> . . . .
>
> (ii) Evidence relating to any aggravating circumstance listed in subsection (d) of which the State had notified the defendant pursuant to § 412(b).' "

*Id.* at 359–60, 473 A.2d at 917.

Section 413(d) lists the aggravating circumstances, of which the seventh is that "the defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration." In our view the same rationale used in *Stebbing* is applicable; the intent of the legislature is as clear in the instant case as it was in *Stebbing.* We reject Grandison's argument.

## XXIII

### *Proportionality Review*

Grandison next assails his sentence of death on the basis that such sentence has not been given in any other case where the defendant had been convicted of contract murder (hiring someone else to commit the killing). In the only case of this nature where the State sought the death penalty, *Myers v. State,* 58 Md.App. 211, 472 A.2d 1027, *cert. denied,* 300 Md. 484, 479 A.2d 373 (1984), Myers was given a life sentence. In *Myers,* several mitigating factors were found to exist; Myers had not previously been found guilty of a crime of violence nor entered a plea of guilty or *nolo contendere* thereto; he acted under substantial duress, domination or provocation of another person; his capacity to appreciate the criminality of his conduct was substantially impaired; his act was not the sole proximate cause of the victim's death; it was found unlikely he would engage in further criminal activity; one co-defendant was given a life sentence and the other a grant of immunity. In the instant case only two mitigating factors were found. Grandison had no prior record of a conviction for a crime of violence, and he was not the sole proximate cause of the killings.

Other cases cited by Grandison are so sketchy that we do not find them helpful in trying to make a proportionality review. What we said in *Evans, supra,* bears repeating here:

> "The murders giving rise to this prosecution were as heinous as those in any case to come before us under the present capital punishment statute. No killings could have been more premeditated and deliberate than those here."

304 Md. at 539, 499 A.2d at 1288.

While we acknowledge that Grandison was not the "triggerman," but for him these murders would not have occurred. In our view Grandison is as culpable as Evans and it is clear the legislature intended that he be so found.

## XXIV

*Denial of Effective Assistance of Counsel at Sentencing*

■■■ On February 3, 1984, some two and one half months before trial, while the court was preparing to hear a motion filed by Grandison, the court observed that Grandison intended to represent himself. Accordingly, the court proceeded to conduct a hearing to satisfy itself that Grandison knew he had a right to counsel and was knowingly and voluntarily waiving that right. *See* former Md. Rule 723 c, now 4–215(b).[24] During the course of the colloquy with Grandison, the trial judge pointed out the advantages of having a lawyer to assist at trial and sentencing. Grandison advised the judge he understood, but that he had never waived his right to counsel; he stated he wanted standby counsel who the judge told him would be furnished. Being satisfied that Grandison understood his right to counsel and chose to represent himself, the court made a finding that Grandison had made an intelligent and intentional waiver of his right to an attorney. There the matter rested until after the guilt or innocence phase of the trial had passed. On May 28, 1984, the parties appeared in court for a hearing on Grandison's motion for a new trial and sentencing. It was brought to the trial judge's attention that Grandison and his standby counsel had agreed, after the guilty verdict, that standby counsel would handle the sentencing. Grandison maintained that he was entitled to change his mind about representation because the case actually was two separate trials. The trial judge disagreed with this contention. Nevertheless, because neither Grandison nor standby counsel was prepared to proceed to sentencing, the court allowed an eight day postponement, which was satisfactory to Grandison. Thereafter, a sentencing proceeding was had in front of a jury wherein

---

24. Judge Simpkins, the trial judge, also noted that Judge Fader, of the Circuit Court for Baltimore County, had apparently previously gone over the same matter with Grandison.

Grandison himself produced witnesses and allocuted; the jury imposed the death penalty.

Grandison argues here that as the sentencing proceeding was a matter separate from the guilt or innocence proceeding, he was entitled to counsel. He recognizes that he had previously effectively waived counsel but contends that waiver did not prevent him from having counsel for sentencing under the rationale of *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). We find nothing in *Faretta* which supports Grandison's argument. That case stands for the principle that the State may not force an attorney on an accused who has knowingly and intelligently made a voluntary election to represent himself, which he has a right to do.

■ Grandison also maintains that any prior waiver cannot be held to operate to deny him the right to counsel at a subsequent separate proceeding. He relies on former Md. Rule 723,[25] which he argues mandates readvisement (of right to counsel) at every separate proceeding; his reliance is misplaced. Section d 2 of Rule 723 provides:

> "If the defendant appears in court without counsel, at any proceeding after his appearance pursuant to section a of this Rule, the court may not proceed before determining whether the defendant at that time desires to waive counsel, *or has waived counsel, either affirmatively or by neglecting or refusing to obtain counsel.*" (emphasis added).

This language is clear and unambiguous; it states no prohibition to proceeding when there has been an affirmative waiver of counsel as here.

## XXV

### Admissibility of Victim Impact Statement

■ We are here asked to reconsider our analysis in *Lodowski v. State*, 302 Md. 691, 490 A.2d 1228 (1985), *rev'd*

---

**25.** Now Rule 4–215, effective after this trial.

*on other grounds,* —— U.S. ——, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986), of the admissibility of victim impact statements in death penalty cases; we decline to do so except in the context of the prohibition against *ex post facto* laws. *See* U.S. Constitution, art. I, § 9; Md.Decl. of Rts., art. 17. Grandison argues that prior to July 1, 1983 the thrust of the law relating to victim impact statements was to compensate the victim for financial losses; that effective July 1, 1983, the permissible scope of victim impact evidence was vastly broadened to include evidence of the effect of the crime on the victim's family and made this type of evidence admissible in capital sentencing proceedings. Consequently, he argues the new statute rendered the act of which he was found guilty punishable in a manner in which it was not punishable when it was committed.

In our view Grandison has misread the law in existence prior to July 1, 1983. Article 41, § 124 of the Maryland Code was not limited to compensation to a victim for financial losses. By its terms the act provided:

"(c)(2)(i) The presentence investigation shall include a victim impact statement, if:

1. The defendant, in committing a felony, caused physical, psychological, or economic injury to the victim; or

\* \* \* \* \* \*

(3) A victim impact statement shall:

(i) Identify the victim of the offense;

(ii) Itemize any economic loss suffered by the victim as a result of the offense;

(iii) Identify any physical injury suffered by the victim as a result of the offense along with its seriousness and permanence;

(iv) Describe any change in the victim's personal welfare or familial relationships as a result of the offense;

(v) Identify any request for psychological services initiated by the victim or the victim's family as a result of the offense; and

(vi) Contain any other information related to the impact of the offense upon the victim that the court requires."

It is clear, then, that considerations other than financial losses were allowed. The law as changed in 1983 specifically provided for use of the statement in death penalty cases and inserted "or the victim's family" in subparagraph (vi) of paragraph (3) in subsection (c) and added a new paragraph (4) which is not pertinent here. We believe the prior law was broad enough to have allowed the information now specifically set out in the current law. Consequently, we see no validity to Grandison's *ex post facto* argument. Furthermore, the 1983 amendment to Article 41, § 124 was only procedural and ameliorative. The change simply set forth an additional source from which victim impact information could be obtained, namely, the victim's family. The new statute does not change the quantum of punishment attached to the crime; hence, the current law is no more onerous to Grandison than it was prior to its amendment. *See Tichnell v. State*, 287 Md. 695, 734–37, 415 A.2d 830, 850–52 (1980) (*Tichnell I*). Accordingly, we think it clear that the prohibitions against *ex post facto* laws were not violated in this case.

## XXVI

### *Right of Jury to Extend Mercy at Sentencing*

 Grandison complains that the jury in a death penalty sentencing proceeding has the right to show mercy and compassion in its sentence determination and the trial judge erred in not so allowing.

Building on former Md. Rule 759 f,[26] which was in force at the time of his sentencing, Grandison argues that nothing in the death penalty statute prohibits the exercise of compassion or mercy pursuant to the rule. Section f of the rule states:

---

**26.** Now Rule 4–327(e).

"f. *Recommendation of Mercy.*

A jury may attach to its verdict a recommendation to the court to show mercy to a defendant. The recommendation is not binding upon the court."

The issue arose because of two circumstances that occurred during the proceedings. First, during voir dire of prospective jurors each was asked individually whether after listening to all the evidence and to what the judge said the law was, and having become convinced that based thereon the law required the death penalty, they would be able to give the death penalty. Second, Grandison requested the trial judge give the following instruction:

"The State alleges that the following aggravating circumstance applies in this case:

The Defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration.

Unless you find beyond a reasonable doubt that this particular aggravating circumstance exists, you must mark 'No' in the space opposite that aggravating circumstance in Section I of the sentencing form, and you may not consider that factor in determining the appropriate sentence.

Should you believe that the State has established beyond a reasonable doubt that this aggravating factor exists and is sufficient in your minds to call for the penalty of death, then it is proper for you to exercise your own moral, factual and legal judgment in determining whether that circumstance is sufficient in your minds to call for the punishment of death."

He also requested that the jury be instructed:

"You need not find a mitigating circumstance in order to impose a sentence of life imprisonment. Nothing in the law forbids you from extending mercy out of compassion or belief that life imprisonment is sufficient punishment under all the circumstances."

The trial judge overruled Grandison's objection on the voir dire issue and denied the two requested instructions listed above. Keeping in mind that § 413(g)(8) of Art. 27 specifically allows the jury to set forth in writing any other facts which it finds as a mitigating circumstance, it strikes us that indeed there is ample provision for the jury to show compassion or mercy, albeit based on articulated facts. In our view this comports with the mandates of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *See also Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Gregg,* the Court stated in part:

> "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

428 U.S. at 189, 96 S.Ct. at 2932, 49 L.Ed.2d at 883.

Not only does the Maryland death penalty statute pass constitutional muster, *Ticknell v. State,* 287 Md. 695, 415 A.2d 830, it is flexible enough to allow a jury to show compassion and mercy should the facts and circumstances of the case so warrant. As stated in *Foster v. State,* 304 Md. 439, 475, 499 A.2d 1236, 1254 (1985):

> "If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstance."

In accordance, Judge Simpkins instructed the sentencing jury:

> "The eighth mitigating circumstance is, you will note on your sheet, any other circumstance. In Number Eight you should indicate any other mitigating circumstance or circumstances that you find from the evidence to exist. If from the evidence you found some other circumstance,

other than those listed, you would mark that Number Eight yes, and then you would go and in the space provided below it, write in the nature of the circumstance that you had found."

Judge Simpkins later instructed the jury as to the weighing and balancing of all aggravating and mitigating circumstances. Through these instructions, the jurors were made aware that they could list and weigh any factor or circumstance as mitigating. Hence, the trial court provided the sentencer the opportunity to exercise its own moral judgment within the statutorily prescribed guidelines.

The Maryland death penalty statute is a delicate balance. It provides for an individualized determination of the defendant and the crime by allowing for consideration of a broad range of mitigating factors. *Calhoun v. State,* 297 Md. 563, 468 A.2d 45, *cert. denied,* —— U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1983). But by requiring the articulation of these aggravating and mitigating circumstances, it prevents the sentencer from exercising unguided discretion. *Id.* To have instructed the jury as Grandison requested would have negated the carefully thought out sentencing procedure designed to meet the constitutional requirements set forth by the Supreme Court by injecting the risk of arbitrary and capricious action into the proceeding. Consequently, the court's refusal to give the requested instructions was not error.

Likewise, the objected to voir dire was an accurate statement of the law. In certain circumstances, the imposition of the death sentence is the only legally possible outcome under the statute. *See Stebbing v. State,* 299 Md. 331, 473 A.2d 903, *cert. denied,* —— U.S. ——, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Consequently, the voir dire hypothetical, clearly designated as such, was not reversible error.

## XXVII

### *Failure to Further Redact Presentence Report*

Pursuant to Art. 27, § 413(c)(1)(iv), the State was prepared to offer at the sentencing hearing a presentence

report, parts of which were being objected to by Grandison. (We observe that under subsection (iv) of section (c) above, a presentence investigation report, less any recommendation as to sentence, is admissible). Some of the objections were eliminated by agreement, but others were not resolved until brought to the trial judge's attention. It is from the ruling on these objections that Grandison complains.

■ First, Grandison claims that failure to sustain his objection to a "detailed account of the State's evidence connecting [him] to narcotics transactions that formed the underlying basis for [his] federal drug convictions" was error under *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983). This is so, he argues, because in *Scott* we said in part that section 413(c)(1)(iii) precludes, in a death penalty case, inflammatory and detailed evidence of the underlying facts and circumstances surrounding unrelated crimes. In our view the objected to facts in the presentence report do not fall into the classification of "inflammatory and detailed evidence." In this case the facts underlying the federal drug charges did not reveal much more than the fact of a conviction revealed. The conviction for possession with intent to distribute heroin and cocaine and the recitation of facts showing that such substances were found in a motel room associated with Grandison hardly added anything to the fact of the conviction and certainly were not inflammatory. So far as Grandison's complaint that the presentence report contained an inaccurate assertion that he was on parole at the time the crime was committed, we believe this to be nonprejudicial and under all the circumstances not grounds for reversal.

## XXVIII

### *Merger*

Appellant would next have us hold that under the required evidence test, *see, e.g., Thomas v. State*, 277 Md.

257, 267, 353 A.2d 240, 246 (1976), his convictions of accessory before the fact to murder and conspiracy to murder must merge for sentencing purposes. Nowhere does he indicate which conviction should merge into the other. We do not agree as the two offenses do not merge.

Grandison was charged with two counts of murder in the first degree through the form provided for in Art. 27, Sec. 616. He was also charged with conspiracy to murder. Since he was in prison at the time of the killings, his convictions for the murders obviously were based on his being an accessory before the fact.

■■■■ It is clear that the substantive crime of murder is distinct from the crime of conspiracy to commit the murder. The argument is made here, however, that since Grandison's murder conviction was based on his being an accessory before the fact, his conviction for conspiracy to murder and the murder conviction should merge. What Grandison overlooks simply is that accessoryship is not a substantive crime but merely the mechanism by which culpability for the substantive crime is incurred. A completed crime is a necessary element. With conspiracy to murder, on the other hand, once the agreement to murder has been made, the crime is complete without any further action. In short, each of these crimes requires an element distinct from the other. Conspiracy to murder requires an agreement, while murder, regardless of whether one is convicted as an accessory or a principal, requires the completed crime. Thus it is apparent that the conspiracy to murder is a separate and distinct crime from the substantive crime itself.

■■■ While we have not had occasion to discuss this specific issue previously, the United States Supreme Court and several of our sister jurisdictions have done so. In *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), the Supreme Court stated in pertinent part:

"Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. . . . Thus, the charge of conspiracy requires proof not essential to the

convictions on the substantive offenses—proof of an agreement to commit an offense against the United States—and it cannot be said that the substantive offenses and the conspiracy are identical."

The Supreme Court of Maine, in addressing the identical issue, stated:

"It is, therefore, possible to aid or abet in the commission of a crime without at the same time having agreed to commit such crime. As stated by the United States Supreme Court:

Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy. *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, [364] 98 L.Ed. 435 (1954).

Accord: *Ottomano v. United States*, 468 F.2d 269, 271 (1st Cir.1972); *United States v. Tropiano*, 418 F.2d 1069, 1083 (2d Cir.1969) cert. denied 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530, 1970. This rule is merely an offshoot of the well-established principle that a conspiracy, as an inchoate offense, and the completed substantive offense are separate crimes. *Pereira v. United States, supra; Pinkerton v. United States*, 328 U.S. 640, 643–644, 66 S.Ct. 1180 [1181–1182], 90 L.Ed. 1489 (1945) (and cases cited therein)."

*State v. Williams*, 395 A.2d 1158 (Me.1978).

Also, in *Rufer v. State*, 274 Ind. 643, 413 N.E.2d 880 (1980), it was stated:

"The petitioner contends that his convictions should merge, based on *Elmore v. State*, (1978) 269 Ind. 532, 382 N.E.2d 893. The record shows two separate offenses. *Geisleman v. State*, (1980) Ind. [274 Ind. 241] 410 N.E.2d 1293, 1297.

To prove a conspiracy, the State was required to show an agreement to commit a felony. Ind.Code § 35–1–

111–1 (Burns 1975). The evidence shows that prior to their driving to the scene of the crime, the perpetrators concluded an agreement to commit the robbery.

To prove one guilty as an accessory before the fact, the prosecutor must show that the defendant aided or abetted the commission of a felony, or counseled, encouraged, hired, commanded, or otherwise procured a felony to be committed. Ind.Code § 35–1–29–1 (Burns 1975). The evidence of this offense consists of the testimony of an accomplice, Caron, and the petitioner's confession, which he repudiated at trial.

The record shows that while the conspiracy was completed before the robbery began, the jury could reasonably have inferred that the petitioner's aid and encouragement continued until the robbery victim was shot. *See Buhrt v. State,* (1980), Ind. [274 Ind. 370] 412 N.E.2d 70." *Accord, People v. Carter,* 415 Mich. 558, 330 N.W.2d 314 (1982); *State v. Looney,* 294 N.C. 1, 240 S.E.2d 612 (1978); *State v. Branch,* 288 N.C. 514, 220 S.E.2d 495, *cert. denied,* 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1975); and LaFave & Scott, Criminal Law § 62 (1972). We believe these authorities persuasive.

Accordingly, we find no merit to this contention.

## XXIX

### *Failure to Excuse Juror*

■ This issue concerns the complaint of Grandison that the trial judge erred in not releasing a juror from further service because of an incident which occurred just before the sentencing proceeding was to begin. The record shows that one of the jurors gave a sealed envelope containing religious tracts to a bailiff with the request that he give it to Grandison after the trial was over. The bailiff advised the trial judge of the matter and was instructed to give the unopened envelope back to the juror; this was done. Nothing was said to Grandison or anyone else until the next time the case came on for further proceedings. A hearing was

held at which the bailiff and the juror were questioned by the State and Grandison. At this time the juror explained that she desired to give these tracts to Grandison because she was concerned about his soul; she wanted him to "get right with God." She also stated she had not discussed this matter with other jurors. The juror furthermore stated she had made no decision relative to the appropriate sentence Grandison should receive and could make that determination based on the the evidence and the law. Neither the State nor Grandison sought any relief from the court at this time, although the next day Grandison did move for a mistrial which the court denied.

On appeal, Grandison does not argue error in the denial of his mistrial motion. He merely states that the trial judge should have *sua sponte* replaced the juror. We believe Grandison's argument lacks merit. It seems to us that the time to have voiced an objection to the juror's continued service was at the time the issue came up, when the court could have taken appropriate steps. In short, Grandison has waived any right to complain.

## XXX

### Comments of Trial Judge in Jury's Presence

Grandison's next complaint involves the allegation that he was denied a fair trial because on three occasions the trial judge made comments in the jury's presence that implied that sufficient proof existed to find Grandison guilty. The first instance occurred when the court was asked if it had ruled on an objection made by Grandison to hearsay statements of the co-conspirators. The basis of the objection was that there had been no conspiracy yet shown and "because of all this hearsay evidence...." The court responded, "Yes, there has been." Grandison's standby counsel responded, "Note the objection, please." It is clear what the objection went to—the hearsay statements, not the court's comments. No further relief was sought by Grandison. While we do not approve of the court comment-

ing in front of the jury as it did, we believe Grandison could have sought some corrective action by the trial judge, keeping in mind he had already advised the jury that his legal rulings should not be taken to indicate how he felt about the case.

The second incident occurred as the court was temporarily excusing the alternate jurors when the panel was given the case to decide guilt or innocence. The judge stated:

"However, there is a possibility, depending on what the sentence may be, that a juror may have to be called back—the jury may have to be called back later for a second hearing, as I told you once before."

It is obvious to us, as it must have been to anyone who heard this remark, that the court committed a slip of the tongue and nothing more. Taken in the context that the word "sentence" was used, the only logical understanding of what the court meant was to say depending on what the *verdict* may be. Furthermore, we do not glean any intent on the court's part to express any opinion as to what that verdict should be.

The third instance cited by Grandison came about while closing argument was being made by his standby counsel. After stating,

"I know that somebody in Baltimore County decided that three other people who were really involved in this thing—you all know that, because you voted that way— three other people are not going to get the death sentence —."

an objection was made by the State's Attorney, followed by this colloquy:

"MR. CRAWFORD [Standby Counsel]: I am surprised you didn't object before, Mr. Levitz.

THE COURT: I am too. A lot of this hasn't been in the evidence anywhere.

MR. CRAWFORD: I believe that every case that I have ever read with this type of thing said there is extreme latitude in a death case, and I would be permitted to go far beyond the evidence.

THE COURT: Extreme latitude. There is an end to all latitudes, Mr. Crawford.

MR. CRAWFORD: Is the Court ruling me out of order on this particular point?

THE COURT: No, sir, I am just saying, your obligation to your profession, try to hold it within the limits. That is all.

MR. CRAWFORD: I realize my obligation to my profession, Your Honor.

THE COURT: I say, keeping that in mind, hold this down within those limits.

MR. CRAWFORD: I am not quite certain I know the nature of Mr. Levitz's objection.

MR. LEVITZ: I would be glad to state the nature of my objection. The statement was not true.

THE COURT: Gentlemen, I don't think you are doing anybody any good by going into this. I think we all understand what the problem is.

MR. CRAWFORD: I am not certain I do, but I will drop that particular subject for the moment."

Grandison argues that the comments by the trial judge, in view of the unique status that he has, carry the potential for influencing the jurors. He further argues that the court's comments related to the weight of the evidence and materially affected his rights.

We agree with the State's argument that there was no error in the court's comment. Indeed there was a lack of evidence to support standby counsel's argument which intended to convey the impression that there was no uniformity throughout the State in the seeking of the death penalty in eligible cases. We find no error here.

## XXXI

### Use of Sentences of Co-conspirators as Mitigating Circumstance

██ With respect to this issue Grandison, on appeal, argues another reason why the trial court erred in refusing

to allow him to refer to the punishment received by three of his co-conspirators. Reference is made to the colloquy just discussed in the previous issue. Grandison argues, for the first time, that he was entitled to have the jury consider these sentences as mitigating factors in determining his sentence. It is clear from the above exchange that the defense voluntarily abandoned this line of argument. Throughout the remainder of Grandison's closing argument, it was never again mentioned. The right of appeal may be waived where there is acquiescence in the decision from which the appeal is taken or by otherwise taking a position inconsistent with the right to appeal. See *Lohss and Sprenkle v. State,* 272 Md. 113, 321 A.2d 534 (1974) and *Rocks v. Brosius,* 241 Md. 612, 217 A.2d 531 (1966). By dropping the subject and never again raising it, Grandison waived his right to appellate review of this issue.

## XXXII

*Use of Expunged Conviction for Purposes of Sentence*

After the jury retired to deliberate on the appropriate sentence for Grandison's murder convictions, the trial judge proceeded to sentence him for his convictions on the conspiracy and handgun counts. During the course of making his sentencing statement the trial judge explained why he was imposing maximum sentences. In doing so he made reference to an expunged 1970 conviction, as well as other convictions, to explain that had Grandison had to serve those sentences he would have been in prison and the present murders would not have occurred. Grandison, of course, objects to the court referring to or considering the 1970 conviction. He contends that the trial judge disregarded Maryland law and the expungement order of the United States District Court. In our view we do not believe the trial judge was basing his sentences on the fact that Grandison had been sentenced to twenty years in 1970 and therefore should be given maximum sentences.

Furthermore, while Grandison does not invoke the Maryland expungement statute, Art. 27, § 739, we observe that § 735(b)(2) of Art. 27 makes clear that the statute does not apply to court records where written opinions have been published. Indeed, the expungement order here, by its terms, was applicable to the Warden, the Commissioner of the Baltimore City Police Department, and the Clerk of the Criminal Court of Baltimore. *See Grandison v. Warden,* 423 F.Supp. 112 (D.Md.1976). We also observe that this order did not prevent the Fourth Circuit from publishing an opinion on Grandison's later conviction for sodomy despite the use of the 1970 conviction for impeachment purposes. *See Grandison v. Warden,* 580 F.2d 1231 (4th Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979).

In short, we see no error here.

### XXXIII

#### *Imposition of Two Death Sentences*

■■■ Grandison next argues that "[p]resumably, the legislature intended that only one death sentence be returned in a case where more than one person was killed.... Moreover, the addition of the option to impose a second penalty unduly enhances the contract murder aggravating factor." We recently answered this argument. In *Evans v. State,* 304 Md. 487, 538, 499 A.2d 1261, 1288 (1985), we said in part:

> "We find no such legislative intent. Each murder was clearly a separate offense. The readily apparent intent of the Legislature in the enactment of the capital punishment statute was to permit consideration of the death penalty under the egregious circumstances of multiple first degree murders. There is no indication of an intent to allow the imposition of that punishment as a sanction for one but not all of the offenses. *Cf., Thomas v. State,*

301 Md. 294, 333–334, 483 A.2d 6 (1984), *cert. denied,* ——
U.S. ——, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985)."
We deem what we said in *Evans* to be dispositive here.

## XXXIV

### *Sufficiency of the Evidence*

The next ground of complaint raised by Grandison relates to the sufficiency of the evidence to sustain the guilty verdicts. He asserts that the State did not prove that he entered into an agreement with Evans whereby he would pay Evans to kill the Piechowiczes. What was lacking, he asserts, was evidence that he was connected to the criminal enterprise or had actually participated in the crime itself. We disagree.

Having charged Grandison with conspiracy to murder Scott and Cheryl Piechowicz, first degree murder of both Scott Piechowicz and Susan Kennedy, and use of a handgun in the commission of a crime of violence, it was incumbent on the State to prove these charges beyond a reasonable doubt. Being aware that Grandison, who was incarcerated at the time of the murders, could not have been the actual killer, the State of necessity had to prove that Grandison made an agreement with someone else to be that actual killer and the agreement had to call for remuneration or promise thereof. *See* Art. 27, § 413(d)(7). Grandison argues that the State fell short of its obligation. We have thoroughly reviewed the record and are satisfied that there was sufficient evidence to have allowed the jury to find an agreement between Grandison and Evans to have Scott and Cheryl Piechowicz killed so they would not be available as witnesses against Grandison in his federal drug trial. Certainly the record is replete with statements from co-conspirators, to each other as well as to third persons, the import of which leads elucidatively to the conclusion that Grandison hired Evans to kill the Piechowiczes. Grandison argues, however, that there was no corroboration of Charlene Sparrow's testimony. We think he is wrong. There was

testimony from others, not co-conspirators, which did corroborate parts of her testimony. For example, the Baltimore City Jail security officer Drewery testified that Janet Moore and Evans visited Grandison on April 26, 1982 as testified to by Sparrow; Theresa Purdie testified about seeing Kelly, Moore, Sparrow and Evans at her residence at which time Grandison phoned Evans; she also testified that Rodney Kelly and Grandison were friends. Finally, Calvin Harper testified that Kelly showed him a machine pistol which he later saw Kelly give to Evans. He also testified that Kelly had told Mike Queen to get $500.00 from his house, an amount testified to as being given to Evans.

It is settled that not much in the way of corroboration of the testimony of a co-conspirator is required. *See Brown v. State,* 281 Md. 241, 378 A.2d 1104 (1977), where Chief Judge Murphy said, for the Court, in part:

"Not much in the way of evidence corroborative of the accomplice's testimony has been required by our cases. We have, however, consistently held the view that while the corroborative evidence need not be sufficient in itself to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself. *See Wright v. State,* 219 Md. 643, 150 A.2d 733 (1959). If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. *McDowell v. State,* 231 Md. 205, 189 A.2d 611 (1963). That corroboration need not extend to every detail and indeed may even be circumstantial is also settled by our cases. *Nolan v. State,* 213 Md. 298, 131 A.2d 851 (1957); *Brown v. State,* 210 Md. 301, 123 A.2d 324 (1956). We have steadfastly adhered to these principles over the years since *Luery* was decided. *See State v. Foster,* 263 Md. 388, 283 A.2d 411 (1971); *Strong v. State,* 261 Md. 371, 275 A.2d 491 (1971); *Veney v. State,* 251 Md. 159, 246 A.2d 608 (1968); *Boggs v. State,* 228 Md.

168, 179 A.2d 338 (1962); *Mulcahy v. State,* 221 Md. 413, 158 A.2d 80 (1960); *Early v. State,* 13 Md.App. 182, 282 A.2d 154 (1971).

In the instant case we believe the testimony of Charlene Sparrow was adequately corroborated and sufficient to identify Grandison with the perpetrators of the crime. There is no merit to this contention.

Grandison also raises several issues which have previously been raised and decided by the Court. These issues and our responses thereto follow.

## XXXV

In providing for the sentence of death by administration of lethal gas, the Maryland capital punishment scheme violates the Eighth and Fourteenth Amendments of the United States Constitution and Articles 16 and 25 of the Maryland Declaration of Rights.

This argument was made and rejected in *Calhoun v. State,* 297 Md. 563, 612–17, 468 A.2d 45, 68–70 (1983).

## XXXVI

The sentence of death is imposed so arbitrarily and infrequently in Maryland as to constitute cruel or unusual punishment under State law.

We reject this argument. *See Stebbing v. State,* 299 Md. 331, 373, 473 A.2d 903, 924, *cert. denied,* —— U.S. ——, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984); *Johnson v. State,* 292 Md. 405, 436, 439 A.2d 542, 560 (1982).

## XXXVII

The Maryland capital punishment statute unconstitutionally placed the burden of proof to show mitigation on the accused.

In *Foster v. State,* 304 Md. 439, 499 A.2d 1236 (1985), we were concerned with this same contention. In response thereto we stated:

"Mrs. Foster, in arguing that the Maryland statute is unconstitutional with respect to a 'defendant's burdens,' also appears to challenge that portion of § 413(g) which provides that if the jury (or court if the defendant so elects) finds beyond a reasonable doubt that one or more of the statutory aggravating circumstances exist, 'it shall then consider whether, based upon a preponderance of the evidence, any' mitigating circumstances exist. As pointed out in *Tichnell I* and discussed above, this provision does not expressly put any burden upon the defendant. But, because § 413(g) does not require the State to disprove the existence of mitigating circumstances, it does place the risk of nonproduction and nonpersuasion on the defendant.

The Court in *Tichnell I,* 287 Md. at 730–734, 415 A.2d 830, dealt with this issue in detail, holding that not placing a burden on the prosecution to prove beyond a reasonable doubt the absence of mitigating circumstances was consistent with *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *Mullany v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), was in accord with the principles articulated in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), and was supported by cases in other states. In *Tichnell I,* 287 Md. at 732, 415 A.2d 830, we quoted from *Patterson,* 432 U.S. at 209, 97 S.Ct. at 2326, that:

'To recognize at all a mitigating circumstance does not require the State to prove its non-existence in each case in which the fact is put in issue, if in its judgment this would be too cumbersome, too expensive, and too inaccurate.'

Generally a defendant in a capital sentencing proceeding will have greater knowledge concerning the presence or absence of mitigating circumstances than the State. Moreover, because of the virtually unlimited scope of what may be deemed by the jury to be a mitigating circumstance under § 413(g)(8), it would be unreasonable

to insist that the State establish the absence of such mitigating factors.

We adhere to our prior holdings that § 413(g) comports with constitutional requirements."

*See also Colvin v. State,* 299 Md. 88, 126, 472 A.2d 953, 971, *cert. denied,* —— U.S. ——, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984) and *Stebbing,* 299 Md. 331, 473 A.2d 903, *cert. denied,* —— U.S. —— 105 S.Ct. 276, 83 L.Ed.2d 212 (1984).

## XXXVIII

The indictment should have been dismissed on the grounds that the State prosecution was in violation of double jeopardy principles.

We decline to reconsider our earlier rejection of this argument. *See Evans and Grandison v. State,* 301 Md. 45, 481 A.2d 1135 (1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985).

## XXXIX

The failure to instruct the jury on the consequences of a failure to reach a verdict on sentence within a reasonable time was reversible error.

■■■ We adopt what we stated in *Calhoun,* 297 Md. 563, 468 A.2d 45, to the effect that no instruction of the effect of a deadlock was required when the jury reaches a decision within a reasonable time. In this case, after many days of trial, the jury reached its verdict in one and one-quarter hours. In our view this was not an unreasonable amount of time.

## XL

*Denial of Motion for Judgment of Acquittal as to the Murder of Susan Kennedy*

■■■ The gist of Grandison's argument here is that as to the murder of Susan Kennedy his motion for judgment of acquittal should have been granted. This is so, he con-

tends, because the State maintained that Kennedy was murdered by mistake and for him to have been legally convicted of that murder the State would have been required to prove he "initiated, arranged, coordinated, commanded or contracted Kennedy's murder."

In our view the doctrine of "transferred intent," recognized in Maryland, is as applicable here as it was in *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974). In *Gladden,* Judge O'Donnell said for the Court:

> "Put another way, 'if one intends injury to the person of another under circumstances in which such a mental element constitutes *mens rea,* and in the effort to accomplish this end he inflicts harm upon a person other than the one intended, he is guilty of the same kind of crime as if his aim had been more accurate.' In such cases all the components of the crime are present. The physical element which consists of a certain general mental pattern is not varied by the particular person who may be actually harmed."

*Id.* at 404, 330 A.2d at 188 (footnote omitted).

The same statement is applicable here. Susan Kennedy's death was the result of a wilfull, deliberate, and premeditated intent to kill for which Grandison is responsible. There was no error in denying the motion.

## XLI

### *Was Death Penalty Improperly Imposed*

■ Grandison argues that because the death penalty can only be imposed upon a person convicted of first degree murder as a principal in the first degree, and because he was not a principal in the first degree but only an accessory to the murders of Piechowicz and Kennedy, the death penalty was improperly imposed. There is no merit to this argument.

Art. 27, § 413(e)(1) provides that the terms "defendant" and "person", except as those terms appear in subsection (d)(7), include only a principal in the first degree. Subsec-

tion (d)(7) of section 413 provides as an aggravating circumstance, "The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration." Thus the legislature has by these provisions made a defendant in Grandison's position subject to the death penalty despite his being an accessory. The sentences of death were not inappropriate.

## XLII

### The Admission of an Assistant U.S. Attorney and Agent Foley's Testimony

Grandison contends here that the entire testimony of an Assistant U.S. Attorney and that of Agent Foley should have been stricken on the grounds of hearsay. Grandison relies for argument on this issue on the argument he made in Issue XV above. We likewise adopt here what we stated in response to Issue XV and find no error.

JUDGMENTS AFFIRMED.